Filed 6/3/13

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BRISBANE LODGING, L.P., Plaintiff and Appellant, v. WEBCOR BUILDERS, INC. et al., Defendants and Respondents. | A132555 (San Mateo County Super. Ct. No. 473170) |

## I.

## INTRODUCTION

In this action concerning a latent construction defect, Brisbane Lodging, L.P. (Brisbane) appeals from a summary judgment entered in favor of respondents Webcor Builders, Inc. and Webcor Builders (collectively, Webcor). The construction contract executed by the parties included a clause which provided that all causes of action relating to the contract work would accrue from the date of substantial completion of the project. This contract provision clearly and unambiguously abrogated the so-called delayed discovery rule, which would otherwise delay accrual of a cause of action for latent construction defects until the defects were, or could have been, discovered. The trial court concluded the clause was valid and enforceable, noting that the agreement "was one between sophisticated parties seeking to define the contours of their liability." Summary judgment was then granted for Webcor after finding that Brisbane's action for latent construction defects was time-barred.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of sections 5, 6, and 7 of part III.

In the published portion of this opinion, we conclude that public policy principles applicable to the freedom to contract afford sophisticated contracting parties the right to abrogate the delayed discovery rule by agreement. Under the clear language of the parties' contract, Brisbane's action was untimely. The time for bringing Brisbane's claims against Webcor started to run upon substantial completion of the project, and Brisbane's lawsuit was brought more than four years after the agreed-upon accrual date, which was outside the applicable limitations period. (Code Civ. Proc., §§ 337, 337.1.)[1] Accordingly, we affirm.

In the nonpublished portion of the opinion, we consider Brisbane's alternative arguments: (1) the trial court's interpretation of the disputed clause was in direct conflict with other provisions of the contract; (2) Webcor's acceptance of responsibility for making repairs to its defective work more than four years after substantial completion of the project raised a triable issue of fact as to whether Webcor itself believed that the parties had not waived the delayed discovery rule; (3) even if the delayed discovery rule was abrogated by contract, Webcor's post-completion conduct indicated it waived its right to rely on this provision; and (4) a new statute of limitations period began from the point in time when Webcor participated in making repairs after the project had been completed. We reject these alternative arguments as well.

## II.

## FACTUAL BACKGROUND

On July 12, 1999, Brisbane and Webcor entered into a contract for the design and construction of a 210-room, eight-story hotel, to be known as the Sierra Pointe Radisson Hotel (the Radisson). Before execution, the agreement had been extensively negotiated between the parties. For example, on March 8, 1999, Brisbane wrote to Webcor: "It is understood and agreed that negotiation of contract documents and satisfaction of customary closing conditions and due diligence must be satisfactory in form and substance to the parties and their respective counsel." Revisions were made by both

---

[1] All statutory references are to the Code of Civil Procedure.

parties to early contract drafts by striking out unacceptable provisions and by inserting additional terms. The form of agreement with "mutually acceptable language," was approved by Brisbane.

The final contract contained the 1997 American Institute of Architects [AIA] "Standard Form of Agreement Between Owner and Contractor (Cost Plus Fee), the AIA Document A201 General Conditions" (AIA A201), and several attachments relating to design requirements, construction allowances, the "Radisson Hotel Design Standards," and standard specifications required by Brisbane's parent company.

One of the provisions of the AIA A201 addressed the commencement of the statutory limitations period for work completed prior to substantial completion of the project:

"**13.7  Commencement of Statutory Limitation Period**

"13.7.1  As between the Owner and Contractor:

".1  **Before Substantial Completion**.  As to acts or failures to act occurring prior to the relevant date of Substantial Completion, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than such date of Substantial Completion . . . ."  (AIA A201, Article 13.7.1.1 (Article 13.7.1.1), original bolding, capitalization omitted.)

It is undisputed that the Radisson was substantially completed on July 31, 2000.

In early 2005, Brisbane learned that there was a kitchen sewer line break which caused waste to flow under the Radisson.  It notified Webcor of the problem and undertook temporary repairs to address the issue.  By late March 2005, Webcor visited the site.  It determined that the plumbing problem was a latent defect, and that Therma Corporation (Therma), the plumbing contractor, was responsible for the problem. Therma made repairs to the kitchen sewer line in July 2005.

About two years later, additional problems with the plumbing system arose.  In October 2007, Brisbane again informed Webcor and Therma of the situation.  Both Webcor and Therma returned to the Radisson to inspect the problem.  Webcor thereafter notified Brisbane that it preferred to have Therma perform the necessary exploratory

3

work to identify the source of the leakage in the kitchen sewer system. Therma did not make repairs, but did run a camera through a different portion of the kitchen drainage pipe. The camera fell out of the pipe, indicating the pipe had become disconnected. Therma failed to provide this information to Brisbane. In January 2008, Webcor notified Brisbane that both Webcor and Therma considered the issue closed. Brisbane took issue with that statement and responded that the matter "is certainly not closed." Ultimately, Brisbane discovered, among other things, that Therma had used ABS pipe material rather than cast iron pipe for the sewer line, in violation of the Uniform Plumbing Code.

In May 2008, Brisbane filed a complaint against Webcor for breach of contract, negligence, and breach of implied and express warranties. Webcor moved for summary judgment contending that the action was barred by Article 13.7.1.1. It argued that, pursuant to that provision, the statute of limitations for Brisbane's causes of action began to run on the date of substantial completion. Brisbane opposed the motion, contending: (1) it had never agreed to waive its right to sue for latent defects; (2) Article 13.7.1.1 was too vague to be interpreted as a waiver of the provisions of section 337.15, which sets a maximum 10-year period to sue for latent defects; and, (3) a clause purporting to abrogate the discovery rule would be against public policy.

The trial court ruled as a matter of law that Article 13.7.1.1 clearly and unambiguously abrogated the delayed discovery rule and the provisions of section 337.15 which apply to claims arising out of latent construction defects. Under Article 13.7.1.1, the latest date upon which Brisbane could have commenced suit on its claims against Webcor was July 31, 2004, four years after substantial completion of the project (§§ 337, 337.1). Brisbane commenced its action on May 27, 2008, nearly four years later, making Brisbane's action untimely as a matter of law, and subject to dismissal on summary judgment.

4

# III.

## DISCUSSION

### A. Standards of Review

We review a trial court's grant of summary judgment de novo. (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 388-389.) "In performing our de novo review, we must view the evidence in a light favorable to [the] plaintiff as the losing party [citation], liberally construing [its] evidentiary submission while strictly scrutinizing [the] defendant['s] own showing, and resolving any evidentiary doubts or ambiguities in [the] plaintiff's favor. [Citations.]" (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768-769.) Summary judgment is proper "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . ." (§ 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)

The "interpretation of a contract is subject to de novo review where the interpretation does not turn on the credibility of extrinsic evidence. [Citation.]" (*Morgan v. City of Los Angeles Bd. of Pension Comrs*. (2000) 85 Cal.App.4th 836, 843; accord, *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co*. (2003) 107 Cal.App.4th 516, 520.) Moreover, the question of whether a contract provision is illegal or contrary to public policy "is a question of law to be determined from the circumstances of each particular case. [Citation.]" (*Jackson v. Rogers & Wells* (1989) 210 Cal.App.3d 336, 349-350.)

### B. Analysis

#### 1. Principles Governing Accrual of Construction Defect Causes of Action

Generally, in both tort and contract actions, the statute of limitations "begins to run upon the occurrence of the last element essential to the cause of action." (*Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 187.) "The cause of action ordinarily accrues when, under the substantive law, the wrongful act is done and the obligation or liability arises . . . ." (3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 493, p. 633.) To ameliorate the harsh effects of that rule, a number of exceptions have developed by statute and judicial decision, "[t]he most important" one being the delayed

discovery rule.   (3 Witkin, Cal. Procedure, *supra*, Actions, § 497, p. 635; see *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397.)  A cause of action accrues under the discovery rule when the " 'plaintiff either (1) actually discovered his injury and its negligent cause or (2) could have discovered injury and cause through the exercise of reasonable diligence . . . .' [Citations.]" (*Leaf v. City of San Mateo* (1980) 104 Cal.App.3d 398, 407 (*Leaf*), italics omitted.)  The delayed discovery rule has been applied in "cases where it is manifestly unjust to deprive plaintiffs of a cause of action before they are aware that they have been injured." (*Id.* at pp. 406-407.)  The rule protects a plaintiff who is " 'blamelessly ignorant' " of his cause of action. (*Id.* at p. 408.)

"This discovery rule takes into account the policy of deciding cases on the merits as well as the policies underlying the statute of limitations (to prevent stale claims and to require diligent prosecution).  'Because a plaintiff is under a duty to reasonably investigate and because a *suspicion* of wrongdoing, coupled with a knowledge of the harm and its cause, will commence the limitations period, suits are not likely to be unreasonably delayed, and those failing to act with reasonable dispatch will be barred.  At the same time, plaintiffs who file suit as soon as they have reason to believe that they are entitled to recourse will not be precluded.' [Citation]." (*Goldrich v. Natural Y Surgical Specialties, Inc.* (1994) 25 Cal.App.4th 772, 779.)

"In 1967, the Legislature responded in part to these developments by adopting section 337.1.  [Citation.]  This statute provides that recovery for death, injury, or damage caused by a '*patent* deficiency' (§ 337.1, subd. (a), italics added) in the design, supervision, or construction of an improvement to realty must be sought within *four* years after substantial completion of the improvement.  [Citation.]  A 'patent deficiency' is defined as one 'apparent by reasonable inspection.' [Citation.]" (*Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 374 (*Lantzy*).)  However, under section 337.1, the building industry remained liable indefinitely for undiscovered defects. (*Ibid*.)  In 1971, the Legislature enacted section 337.15, placing an outside 10-year limit on actions arising out of latent construction defects. (*Lantzy*, at pp. 375-377.)

6

"[F]aced with a developing body of common law on the subject, [the Legislature] carefully considered how to provide a fair time to discover construction defects, . . . while still protecting a vital industry from the damaging consequences of indefinite liability exposure. For latent deficiencies, the lawmakers rejected shorter periods in favor of a limit in the upper range of those previously adopted by other jurisdictions." (*Lantzy*, *supra*, 31 Cal.4th at p. 377, italics added.)

In relevant part, section 337.15 provides: "(a) No action may be brought to recover damages from any person . . . who develops real property or performs or furnishes the design, specifications, surveying, planning, supervision, testing, or observation of construction or construction of an improvement to real property more than 10 years after the substantial completion of the development or improvement for any of the following: [¶] (1) Any latent deficiency in the design, specification, surveying, planning, supervision, or observation of construction or construction of an improvement to, or survey of, real property [and] [¶] (2) Injury to property . . . arising out of any such latent deficiency. [¶] (b) As used in this section, 'latent deficiency' means a deficiency which is not apparent by reasonable inspection."

Section 337.15, is an "ordinary, procedural statute of limitations," and when read together with sections 337 and 338, "[it] enacts . . . a two-step limitation; actions founded upon a latent defect in the development of real property must be filed within three or four years of discovery, depending on whether the action rests on breach of warranty or negligence, but in any case within ten years of the date of substantial completion of the improvement." (*Regents of University of California v. Hartford Acc. & Indem. Co.* (1978) 21 Cal.3d 624, 641-642 (*Regents*).)

### 2. *The AIA Contract Language Adopted by the Parties in Article 13.7.1.1*

As noted, the parties agreed in Article 13.7.1.1 that "any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than such date of Substantial Completion . . . ." This provision is the AIA standard accrual provision and, at the time, was in wide usage throughout the United States. It has been recognized that "[f]or the

construction industry the standard form contract—particularly the AIA Standard Document set—has in several respects served as a surrogate for a commercial code. The AIA contract developed gradually over the generations in company with an expanding body of experience in the field and in the courts, and was adopted verbatim, adapted, or parroted in a vast percentage (perhaps the majority) of private commercial contracts. It offers industry actors a degree of coherence, certainty and uniformity. Depending on one's point of view, it may also serve as a backdrop for performance which more or less reflects commercial realities and competing participant concerns." (*Reconstructing Construction Law: Reality and Reform in a Transactional System* (1998) Wis. L.Rev. 463, 485.)

While the enforceability of the 1997 AIA standard contract accrual waiver presents a question of first impression in California, numerous out-of-state authorities have examined this same clause; and without exception, have concluded the provision altered the normal rules governing accrual of causes of action, including the delayed discovery rule, and was valid and enforceable. (See, e.g., *Old Mason's House v. Mitchell* (Ky. Ct.App. 1995) 892 S.W.2d 304, 305-307; *College of Notre Dame v. Morabito* (Md.App. 2000) 752 A.2d 265, 271-276; *Northridge Homes, Inc. v. John W. French & Associates, Inc.* (Mass. Super., Nov. 15, 1999) 10 Mass.L.Rptr. 690, 1999 WL 1260285; *Oriskany Cent. School Dist. v. Edmund J. Booth Architects* (1994) 206 A.D.2d 896, 615 N.Y.S.2d 160 (N.Y.App.Div. 1994), *aff'd*, 85 N.Y.2d 995, 630 N.Y.S.2d 960, 654 N.E.2d 1208 (N.Y. 1995); *Gustine Uniontown v. Anthony Crane Rental* (Pa. 2006) 892 A.2d 830, 836-837.)

The reasoning of these out-of-state cases is fairly consistent and is ably represented by *Harbor Court Associates v. Leo A. Daly Co*. (4th Cir. 1999) 179 F.3d 147 (*Harbor*). That case involved a lawsuit by the developer of a condominium tower, office building, hotel, health club, and parking garage against the project's architect for tort and breach of contract claims alleging defective design work by the architect. (*Id.* at p. 148.) The court, applying Maryland law, enforced a contractual provision which specified that a cause of action between the owner and contractor commenced to run upon substantial

completion of the work in accordance with the applicable statute of limitations. (*Ibid.*) The court observed that Maryland, like California, had adopted the delayed discovery rule for purposes of establishing an accrual date "to relieve the 'blamelessly ignorant,' [citation] of the 'often harsh and unjust results which flow from [such] a rigid application of the statute of limitations.' [Citation.]" (*Id.* at p. 150.) However, the federal appeals court noted that neither the courts nor the legislature of Maryland had ever stated that the discovery rule could not be waived by contract. (*Ibid.*)

The *Harbor* court observed that Maryland had expressed "considerable reluctance to strike down voluntary bargains on public policy grounds." (*Harbor*, *supra*, 179 F.3d at p. 150.) Therefore, "[i]n light of this established judicial commitment to protecting individuals' efforts to structure their own affairs through contract, we cannot conclude that the Maryland Court of Appeals would decline to allow parties to contract around the state's default rule establishing the date on which a relevant statute of limitations begins to run. This is especially true where, as here, the parties to the agreement are *sophisticated business actors who sought, by contract, to allocate business risks in advance*. That is, rather than rely on the 'discovery rule,' which prolongs the parties' uncertainty whether or if a cause of action will lie, the parties to this contract sought to limit that period of uncertainty by mutual agreement to a different accrual date." (*Id.* at pp. 150-151, italics added.) In concluding that Maryland law would allow the parties to waive the delayed discovery rule by contract, it noted that all other states which had addressed the precise issue, including Kentucky, New York, and Wisconsin, had similarly allowed the delayed discovery rule to be waived or modified by contract. (*Id.* at p. 151.)

Although we are not bound to follow these out-of-state authorities, they reflect a broad consensus as to the proper interpretation of the AIA's standard agreement's accrual provision under circumstances identical to the circumstances present in this case—that is, where the provision was freely entered into by parties represented by legal counsel engaged in a sophisticated commercial construction project.

9

Since latent defects in construction are usually the types of defects an owner may not learn about until years after completion, litigation often results over exactly when the owner discovered, or should have discovered, the defect.  (See, e.g., *Creekridge Townhome Owners Assn. Inc. v. C. Scott Whitten, Inc.* (2009) 177 Cal.App.4th 251, 257-259; *Renown, Inc. v. Hensel Phelps Construction Co.* (1984) 154 Cal.App.3d 413, 420-421; *Leaf*, *supra*, 104 Cal.App.3d at pp. 407-408.)  By tying the running of the applicable statute of limitations to a date certain, the parties here negotiated to avoid the uncertainty surrounding the discovery rule for the security of knowing the date beyond which they would no longer be exposed to potential liability.  Like the out-of-state courts that have considered this provision, we conclude that sophisticated parties should be allowed to strike their own bargains and knowingly and voluntarily contract in a manner in which certain risks are eliminated and, concomitantly, rights are relinquished.

### 3.  *Is the Accrual Provision Adopted by the Parties Void as Against California Public Policy?*

Notwithstanding the consistent line of out-of-state authorities enforcing the contract provision adopted by the parties here, Brisbane argues that the contract provision should not be enforced because it violates California's public policy.  Specifically, Brisbane argues Article 13.7.1.1 is void as against public policy because it "served to preclude Brisbane from relying on the delayed discovery doctrine in pursuing its claims for the latent defects in Webcor's work that did not manifest themselves until years after the construction project was complete."

In advancing this argument, Brisbane assumes a heavy burden.  A party seeking to avoid enforcement of a contract on public policy grounds has the burden " 'to show that its enforcement would be in violation of the settled public policy of this state, or injurious to the morals of its people.  [Citation.]'  [Citations.]" (*Bovard v. American Horse Enterprises, Inc.* (1988) 201 Cal.App.3d 832, 839.)  Courts have been cautious not to " 'blithely apply[] public policy reasons to nullify otherwise enforceable contracts.' " (*Dunkin v. Boskey* (2000) 82 Cal.App.4th 171, 183-184 (*Dunkin*); see also *VL Systems, Inc. v. Unisen, Inc.* (2007) 152 Cal.App.4th 708, 713.)

10

While Brisbane argues "the delayed discovery doctrine has been long recognized under California law as being necessary to further California public policy," it offers little insight into exactly which public policies would be violated by enforcement of Article 13.7.1.1 under the facts and circumstances here. Indeed, the delayed discovery rule has most often been described as an equitable doctrine designed to achieve substantial justice in situations where one party has an unfair advantage and it would be inequitable to deprive "an 'otherwise diligent' plaintiff in discovering his cause of action. [Citations.]" (*Berson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 931; *K.J. v. Arcadia Unified School Dist.* (2009) 172 Cal.App.4th 1229, 1241 ["[c]ourts equitably may apply the delayed discovery doctrine to a cause of action arising out of childhood sexual abuse"].) It is normally applied in situations where there is a "fiduciary, confidential or privileged relationship"—basically, where individuals hold "themselves out as having a special skill, or are required by statute to possess a certain level of skill" and it is manifestly unfair to deprive plaintiffs of their cause of action before they are aware that they have been injured. (*Moreno v. Sanchez* (2003) 106 Cal.App.4th 1415, 1424 (*Moreno*); *Leaf, supra,* 104 Cal.App.3d at pp. 406-407.)

Further undercutting Brisbane's assertion that Article 13.7.1.1 is void as against public policy is our Supreme Court's conclusion, stated almost a century ago, that "statutes [of limitations] are regarded as statutes of repose, carrying with them, not a right protected under the rule of public policy, but a mere personal right for the benefit of the individual, which may be waived. [Citations.]" (*Tebbets v. Fidelity and Casualty Co.*

11

(1909) 155 Cal. 137, 139; accord, *Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.* (1995) 38 Cal.App.4th 1532, 1548 (*Hambrecht*).)[2]

Similarly, the California Legislature itself has expressly recognized that statutory limitations periods are not imbued with any element of nonwaivable "public policy," and that private agreements waiving a defense based on the statutes of limitations are valid and enforceable. For example, section 360.5 specifically allows statutes of limitations generally to be waived by written agreement. By enacting this statute, the Legislature has recognized that parties have a contractual right to opt out of the statutorily mandated limitations periods. (See also *Cowan v. Superior Court* (1996) 14 Cal.4th 367, 372 [permitting criminal defendant to waive statute of limitations].) Additionally, California courts have overwhelmingly granted contracting parties substantial freedom to *shorten* an otherwise applicable statute of limitations, so long as the time allowed is reasonable. (See, e.g., *Hambrecht*, *supra*, 38 Cal.App.4th at pp. 1547-1548 [noting California's broad rule allowing waiver and citing cases upholding the shortening of the four-year statute of limitations governing breach of a written contract to as short as three months].)

The foregoing legal authorities reflect the broader, longstanding established public policy in California which respects and promotes the freedom of private parties to contract. (*Carma Developers (Cal.) Inc*. v. *Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 363, citing *In re Garcelon* (1894) 104 Cal. 570, 591 [public policy requires " 'that men of full age and competent understanding shall have the utmost liberty of contract, and that their contracts when entered into freely and voluntarily shall be held sacred, and shall be enforced by courts of justice' "].) Parties represented by counsel

---

[2] To the extent there is any recognizable public policy underlying statutes of limitations, it is to *limit* the time within which claims may be brought, not to *lengthen* the time period. On this point, the court in *Hambrecht*, *supra*, 38 Cal.App.4th at page 1548, footnote 16, noted: "Although *Tebbets*'s waiver analysis has withstood the test of time, subsequent Supreme Court cases have commented that the statutes of limitations do serve public policies. (See *Pashley v. Pacific Elec. Ry. Co.* (1944) 25 Cal.2d 226, 228-229 . . . [statutes of limitations further peace and welfare of society by preventing unexpected enforcement of stale claims]; *Scheas v. Robertson* (1951) 38 Cal.2d 119, 125 . . . [same].)"

12

have even been allowed to waive the protection of Civil Code section 1542, thereby giving up the right to bring suit on unknown or unsuspected claims at the time the contract is executed.[3]  (See, e.g., *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166-1169 (*Winet*); *Salehi v. Surfside III Condominium Owners Assn.* (2011) 200 Cal.App.4th 1146, 1160-1161 (*Salehi*) [waiver of unknown claims extended to plumbing problems in condominium complex].)  This is true even if the parties claim to have intended something else.  (See *Salehi*, at p. 1159 [evidence of undisclosed subjective intent irrelevant to determining meaning of contractual language]; *Winet*, at p. 1167 [same].)

Consequently, we disagree with Brisbane's position that public policy supports an iron-clad, universal rule that in all cases involving latent defects, the applicable statute of limitations cannot begin to run until the defects were or should have been discovered, notwithstanding a contractual agreement to the contrary.  Instead, we believe that where the parties are on equal footing and where there was considerable sophisticated give and take over the terms of the contract, those parties should be given the ability to enjoy the freedom of contract and to structure risk-shifting as they see fit without judicial intervention.  While Brisbane now decries the unfairness of a contract provision that may result in the loss of entitlement to sue for damages it did not discover in a timely fashion, this is precisely the arrangement to which it agreed.

We also point out that the Legislature itself has limited the scope and effect of the delayed discovery rule, even where it has not been waived by the parties.  In enacting section 337.15, the Legislature provided that if damage is caused by a latent defect in construction, the claim must be brought no later than 10 years after the construction is substantially completed, *regardless of whether the plaintiff actually discovers the injury within the 10-year period.*  (See *A & B Painting & Drywall, Inc. v. Superior Court* (1994) 25 Cal.App.4th 349, 355 [§ 337.15 imposes an absolute 10-year bar "*regardless of*

---

[3]  Civil Code section 1542 provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

13

*discovery*" (italics added)].)  The parties herein, seeking to protect themselves " 'from the damaging consequences of indefinite liability exposure,' " simply agreed to shorten this 10-year period to a period equivalent to the applicable statute of limitations—in this case up to four years.  (*Inco Development Corp. v. Superior Court* (2005) 131 Cal.App.4th 1014, 1021.)  This is not unreasonable.  (See, e.g., *Moreno*, *supra*, 106 Cal.App.4th at p. 1434 [four-year period to discover latent defects in order to allege causes of action against home inspector would be reasonable].)

We have been warned that the power of this court to void a contract provision as contravening public policy should be exercised only where the case is free from doubt. (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 777, fn. 53; *Kaufman v. Goldman* (2011) 195 Cal.App.4th 734, 746.)  This is not such a case.  The equitable concerns underpinning the delayed discovery rule, even if supported by public policy, are simply not present here.  There is no indication that Brisbane and Webcor had a unique confidential or fiduciary relationship in which Webcor undertook a duty to inform Brisbane of any vital information, relieving Brisbane of its normal duty of inquiry.  Nor has Brisbane alleged that the parties' contract was induced by misrepresentations or undue influence.

" 'Before labeling a contract as being contrary to public policy, courts must carefully inquire into the nature of the conduct, the extent of public harm which may be involved, and the moral quality of the conduct of the parties in light of the prevailing standards of the community.' [Citation.]" (*Dunkin*, *supra*, 82 Cal.App.4th at p. 183.)  In considering the criteria specified in *Dunkin*, we can think of no public policy considerations that would protect a party such as Brisbane from enforcement of a fairly and honestly negotiated contract provision setting a reasonable fixed time period for discovery of latent construction defects.  Consequently, this court has no difficulty concluding that the parties' decision to forego the potential uncertainty created by the delayed discovery rule in favor of an established accrual date does not rise to the level of being so contrary to public policy that it would trump the parties' freedom to contract.

14

#### *4. This Contract Falls Outside the Reasoning Guiding the Court in* **Moreno**

Brisbane calls our attention to *Moreno*, *supra*, 106 Cal.App.4th 1415, a case in which the court refused to enforce contractual language that had the effect of not only shortening the limitations period, but also waiving the delayed discovery rule. Brisbane claims *Moreno* stands for the proposition that "a contractual provision which purports to eliminate the delayed discovery doctrine is not enforceable." We do not believe *Moreno* can be so broadly interpreted.

In *Moreno*, a couple hired a home inspector to look at a home the couple was considering buying. (*Moreno*, *supra*, 106 Cal.App.4th at p. 1419.) Although Business and Professions Code section 7199 provides for a four-year limitations period accruing from the date of inspection, the parties' preprinted home inspection contract set forth a shortened one-year limitations period running from the date of inspection. (*Moreno*, at p. 1420.)

After the buyers purchased the home, they became ill. (*Moreno*, *supra*, 106 Cal.App.4th at p. 1420.) An environmental evaluation of the house revealed that the air ducts in the home were insulated with asbestos. (*Id.* at p. 1421.) In addition, an unsealed air return was discovered that permitted dust, dirt, and rust to enter the heating system. (*Ibid.*) Fourteen months after the inspection, the buyers sued the home inspector for breach of contract, negligence, and negligent misrepresentation. (*Ibid.*) The trial court sustained the home inspector's demurrer, based on the one-year limitation of actions provision in the home inspection contract. (*Id.* at p. 1422.)

The appellate court reversed in a 2-1 decision. The court acknowledged the " 'well-settled proposition of law that the parties to a contract may stipulate therein for a period of limitation, shorter than that fixed by the statute of limitations, and that such stipulation violates no principle of public policy, provided the period fixed be not so unreasonable as to show imposition or undue advantage in some way.' [Citations.]" (*Moreno*, *supra*, 106 Cal.App.4th at p. 1430, fn. omitted.) Nevertheless, the court concluded that in order for a contractual agreement establishing an accrual date for lawsuits against home inspectors to be enforceable, a homeowner's cause of action

15

against a home inspector cannot commence to run from the date of inspection (as provided by the Legislature when it enacted Business and Professions Code section 7199), but instead, had to run from the date when the homeowner discovers, or with the exercise of reasonable diligence should have discovered, the breach. (*Moreno*, at pp. 1428-1429.)

The court based its ruling on the judicial concern toward protection of homeowners, and the fact that the homeowners must rely on the greater expertise of home inspectors to discover latent defects in the home. The court stated that although the delayed discovery rule originated in cases involving the acts of licensed professionals, the rule may also be applied to trades people who hold themselves out as having a special skill, or who are required by statute to possess a certain level of skill. (*Moreno*, *supra*, 106 Cal.App.4th at p. 1424.) The court reasoned, "Although not as regulated as some fields, the Legislature has recognized the significance of the role home inspectors occupy in this state's economy, as well as the potential hazards of fraudulently or negligently performed inspections. As with other forms of professional malpractice, specialized skill is required to analyze a residence's structural and component parts. Because of the hidden nature of these systems and components a potential homeowner may not see or recognize a home inspector's negligence, and thus may not understand he has been damaged until long after the inspection date." (*Id.* at p. 1428, fns. omitted.)

The *Moreno* court believed that public policy required the application of the delayed discovery rule as a contractual requirement in all home inspection contracts. In the court's words: "[C]auses of action for breach of a home inspector's duty of care should accrue in all cases, not on the date of the inspection, but when the homeowner discovers, or with the exercise of reasonable diligence should have discovered, the inspector's breach." (*Moreno*, *supra*, 106 Cal.App.4th at pp. 1428-1429.) The court "attach[ed] no special significance" to the fact that the Legislature itself did not provide for a rule of delayed discovery when it enacted Business and Professions Code section 7199, which set a maximum four-year outside limitations period for actions against home inspectors measured from the date of inspection. (*Moreno*, at p. 1430.)

16

While *Moreno* has been followed in subsequent cases,[4] we believe its analysis, even if correct, is inapplicable here, and does not compel the conclusion that Article 13.7.1.1 is void as against public policy. Significantly, " '[w]hether a contract is illegal or contrary to public policy is a question of law to be determined *from the circumstances of each particular case*.' [Citation.]" (*Dunkin*, *supra*, 82 Cal.App.4th at p. 183, italics added.)

Unlike the parties here, the plaintiffs in *Moreno* were persons unsophisticated in construction matters (indeed, that is why they hired the home inspector in the first place). The importance of the special relationship between the parties, where the home inspector was a professional in possession of special skills and knowledge upon whom the homeowners relied completely for counsel and advice, was emphasized throughout the court's opinion in *Moreno*. (See *Parsons v. Tickner* (1995) 31 Cal.App.4th 1513, 1526 [stressing " 'importance of the relationship between defendant and plaintiff' " in cases applying the discovery rule of accrual and noting that most involve confidential or fiduciary relationships].) By contrast, Brisbane and Webcor occupied positions of equal bargaining strength and both parties had the commercial and technical expertise to appreciate fully the ramifications of agreeing to a defined limitations period. This conclusion is reinforced by the fact that both parties had the participation and advice of legal counsel during contract negotiations.

---

[4] We point out that none of these cases involve a commercial contract entered into between sophisticated parties of equal bargaining strength where there is no claim of misrepresentation or undue influence. (See *Weatherly v. Universal Music Publishing Group* (2004) 125 Cal.App.4th 913, 919 [following *Moreno*; discovery rule applied to action by songwriter against music publisher where there was evidence that the writer was hindered from discovering the publisher's breach by its misrepresentations]; *Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 183 [following *Moreno*; discovery rule applied to preclude dismissal of action by client against attorney for breach of fiduciary duty]; *William L. Lyon & Associates, Inc. v. Superior Court* (2012) 204 Cal.App.4th 1294, 1308-1309 [following *Moreno*; in case alleging intentional nondisclosure of construction defects by real estate broker]; see also *Zamora v. Lehman* (2013) 214 Cal.App.4th 193 [contract provision contains language adopting delayed discovery rule, making it valid under *Moreno*].)

17

Furthermore, unlike this case, *Moreno* involved a contract clause that not only waived the delayed discovery rule, but also reduced the statute of limitation from four years to one. In our case, Brisbane had the benefit of the full statute of limitations period, up to four years, to conduct any inspections believed necessary to uncover latent defects––a period of time the *Moreno* court itself acknowledges would be reasonable. (*Moreno*, *supra*, 106 Cal.App.4th at p. 1434.)

Lastly, we note that one court, *In re Brocade Communications Systems, Inc.* (N.D.Cal. 2009) 615 F.Supp.2d 1018 (*Brocade*), has found the reasoning in *Moreno* to be unpersuasive in circumstances similar to those presented here where "an agreement between sophisticated parties" was entered into "that defines the contours of their liability." (*Id.* at p. 1040.) The court distinguished *Moreno*, which "merely stands for the limited proposition that a cause of action may not accrue in a suit against a home inspector until the injury is discovered. [Citation.]" (*Ibid.*) The court believed "*Moreno* simply cannot be extended far enough to relieve [the corporation] of the indemnification it agreed to provide . . . ." (*Ibid.*) We find the reasoning of *Brocade* persuasive and agree that this distinction makes *Moreno* inapposite and inapplicable to control the result in this case.

Therefore, based on our review of relevant case authorities, both in California and uniformly throughout the nation, we conclude that Article 13.7.1.1 of the Brisbane/Webcor contract was a valid, enforceable provision freely entered into by sophisticated parties engaging in a commercial construction project. Accordingly, the trial court was correct in granting summary judgment after finding that Brisbane's claims against Webcor were time-barred.

### 5. *There Are No Inconsistent Contractual Provisions That Would Make Article 13.7.1.1 Unenforceable*

Brisbane next contends that the trial court's interpretation of Article 13.7.1.1 renders that provision in direct conflict with other provisions in the parties' contract, contrary to fundamental principles of contract law.

18

At the outset, we emphasize that the trial court found, and we agree, that there are no ambiguities in Article 13.7.1.1. The court found "as a matter of law" that Article 13.7.1.1 was "clear and unambiguous with regard to direct claims against Webcor" and that it "abrogat[ed] the delayed discovery rule." When contracting, if parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the written agreement according to the plain meaning of the language employed and not to strain in order to find ambiguities and inconsistencies that would render a clearly-stated provision unenforceable. (See *Denver D. Darling, Inc. v. Controlled Environments Construction, Inc.* (2001) 89 Cal.App.4th 1221, 1235 [setting out "plain meaning" rule].)

Toward this end, cases recognize that the parties generally " 'intend every clause to have some effect' " and that this intent " 'should not be thwarted except in *the plainest case of necessary repugnance*.' " (*Southern Pacific Land Co. v. Westlake Farms, Inc.* (1987) 188 Cal.App.3d 807, 822, italics added.) Thus, "where different parts of the instrument appear to be contradictory and inconsistent with each other, the court will, if possible, harmonize the parts and construe the instrument in such [a] way that all parts may stand . . . .' " (*Ibid.*) The court " 'will not strike down any portion unless there is an irreconcilable conflict wherein one part of the instrument destroys in effect another part.' [Citation.]" (*Ibid.*)

To establish a conflict, Brisbane extracts language from Article 3.18, a provision applying to Webcor's duty to indemnify Brisbane from losses resulting from third-party claims. Brisbane contends there is an irreconcilable conflict between Article 13.7.1.1 and Article 3.18 of the parties' contract because "in most cases such third party [indemnity] claims would not occur until years after substantial completion and thus an indemnity action would be time barred [under Article 13.7.1.1] before it could even be brought."

But, Article 13.7.1.1 [lawsuits between the parties] and Article 3.18 [third-party claims] cover entirely different subjects, and each provision would take effect under entirely different circumstances. Moreover, Webcor offers the following plausible interpretation of the general intent of the parties' contract as it pertains to

19

indemnification: "Pursuant to Article 13.7.1.3, the statute of limitations for any claim based on Webcor's refusal to indemnify Brisbane *after* issuance of the final certificate of payment (which typically occurs around the time of substantial completion) would accrue upon Webcor's refusal [to adhere to its contractual indemnity obligations], which constitutes 'the date of actual commission of any other act or failure to perform any duty or obligation by the contractor . . . .' Brisbane would then have the full duration of the four-year statute of limitation applicable to claims for contractual indemnity pursuant to Code of Civil Procedure section 337." Under this interpretation, any perceived conflict between Article 13.7.1.1 and Article 3.18 can be harmonized. (See Civil Code, § 1652 ["Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract"].) Thus, we see no conflict, let alone an irreconcilable conflict, which renders the meaning of Article 13.7.1.1 questionable.

Brisbane next claims that any rights Webcor might have had under Article 13.7.1.1 were superseded by Article 13.4.1 which states: "Duties and obligations imposed by the Contract Documents and rights and remedies available thereunder shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law." Brisbane interprets this provision as accomplishing a wholesale obliteration of the express contract provisions which were negotiated by the parties, including Article 13.7.1.1, which deviate from the ordinary rules that would apply in the absence of an agreement to the contrary.

There is no indication that Article 13.4.1 was placed in this contract to wipe out the rights and duties expressly given under the other provisions of the written contract; and we refuse to interpret it in such an absurd manner. *(A.B.S. Clothing Collection, Inc. v. Home Ins. Co.* (1995) 34 Cal.App.4th 1470, 1478 [where contract language covering a subject is clear and explicit, it governs].) A more reasonable interpretation of Article 13.4.1 is that it served a gap-filling function, allowing the parties to take advantage of rights and remedies "otherwise imposed or available by law" in addition to those specified in the contract.

20

### 6. Webcor's Post-Completion Conduct Was Not Competent Evidence of Webcor's Interpretation of Article 13.7.1.1, Nor Did That Conduct Constitute a Waiver of Article 13.7.1.1

Brisbane has taken the alternative positions that even if Article 13.7.1.1 could be an enforceable waiver of the delayed discovery rule, Webcor's post-completion actions reflect that it interpreted Article 13.7.1.1 not to be a waiver of the delayed discovery rule, as evidenced by its attempt to address the defects in the hotel well after any action for latent construction defects was time-barred under that provision. Taking a slightly different tack, Brisbane also argues that this post-completion conduct acted to waive Webcor's reliance on Article 13.7.1.1 to defeat Brisbane's latent defect claims.

As to the first point, we note that the trial court determined, and we agree, that Article 13.7.1.1 is a clear and unambiguous waiver of the delayed discovery rule. Consequently, any purported evidence of the subjective intent of the parties, particularly an attempt to infer that intent from conduct occurring years after the contract was signed, is simply irrelevant. (See *In re Marriage of Iberti* (1997) 55 Cal.App.4th 1434, 1440 ["[e]xtrinsic evidence of the parties' intentions is inadmissible to vary, alter, or add to the terms of an unambiguous agreement"].)

As to the second point, when this matter was under consideration below the court requested supplemental briefing on the issue of "waiver of the subject contract provision based on remedial/repair work . . . ." After considering the parties' submissions, the court held that even if "viewed in the light most favorable to waiver," Brisbane proffered no evidence that could reasonably be construed as Webcor "accepting direct liability for the defects discovered in 2005 and 2007." The court believed that, at most, Brisbane "only establish[ed]" that Webcor "stood ready, willing, and able, to assist" Brisbane "in prosecuting a claim against the plumbing contractor . . . ." Consequently, the court found that no waiver of any defense based upon Article 13.7.1.1 could reasonably be inferred from Brisbane's evidence. We agree.

California courts " ' "will find waiver when a party intentionally relinquishes a right *or when that party's acts are so inconsistent with an intent to enforce the right as to*

21

*induce a reasonable belief that such right has been relinquished*" ' . . . ." (*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1190, original italics.) "The waiver of a legal right cannot be established without clear intent to give up such a right. [Citation.] 'The burden is on the party claiming the waiver to prove it by clear and convincing evidence' " that does not leave the matter doubtful or uncertain. (*Utility Audit Co., Inc. v. City of Los Angeles* (2003) 112 Cal.App.4th 950, 959.) Doubtful cases will be decided against a waiver. (*Kacha v. Allstate Ins. Co.* (2006) 140 Cal.App.4th 1023, 1034.)

As shown by the evidence, the only action taken by Webcor in both 2005 and 2007 consisted of visiting the site to investigate claims made by Brisbane with respect to alleged failures in the kitchen waste line. The investigations occurred long after the contractual limitations period for filing suit had expired. At no time during these on-site visits did Webcor lead Brisbane to believe it would waive the protections of the contractual limitations period, nor did Webcor engage in conduct which would indicate that it was going to take responsibility for the failed kitchen waste line. Brisbane failed to submit any evidence that Webcor itself performed any remedial/repair work on the kitchen waste line. Rather, it simply investigated Brisbane's complaints; and following this investigation, it referred Brisbane to Therma, Webcor's design-build plumbing subcontractor for the project. Webcor offered to help Brisbane analyze Therma's investigation in order to determine the cause of the problems. However, throughout Webcor's communication with Brisbane, the evidence showed Webcor placed the blame squarely on its subcontractor Therma, and attempted to placate Brisbane by pointing to Therma's possible legal culpability for those defects. At some point, Webcor emailed Brisbane to notify it that it assumed Brisbane had resolved the issue, and that it considered the matter closed.

Consequently, we find nothing in the record on summary judgment that would raise a reasonable inference suggesting Webcor's limited response to Brisbane's complaints about defects in the hotel in 2005 and again in 2007 constituted evidence that it did not interpret Article 13.7.1.1 as it now does. Furthermore, such conduct is a far cry

22

from that amounting to waiver of a negotiated contractual right.  Under these circumstances, we agree with the trial court that waiver of Article 13.7.1.1 cannot reasonably be inferred from the evidence proffered by Brisbane.

### 7. *Webcor's Post-Completion Conduct Does Not Give Rise to a New Claim*

Lastly, Brisbane claims that a new statute of limitations period was triggered and the statute commenced to run as of January 3, 2008, when Webcor notified Brisbane that it assumed the kitchen line issue was resolved and that it considered the matter closed. However, after the expiration of the contractual limitation period on July 31, 2004, and in the absence of a third-party claim triggering indemnity obligations, Webcor had no further obligation with respect to the project.  It certainly was under no duty to perform any repairs.  Brisbane argues that "[r]egardless whether the statute of limitations had run, Webcor could be liable for the post-completion work which was defectively performed because Webcor had assumed a duty to have that work performed properly."  However, Brisbane offers no record citations or argument in support of this assertion.  Therefore, we disregard this point.  (*Troensegaard v. Silvercrest Industries, Inc*. (1985) 175 Cal.App.3d 218, 229.)

## IV.

## DISPOSITION

The judgment is affirmed.  Webcor is awarded its costs on appeal.

_____
RUVOLO, P. J.

We concur:

_____
REARDON, J.

_____
RIVERA, J.

23

| | |
|---|---|
| Trial Court: | San Mateo County Superior Court |
| Trial Judge: | Hon. Joseph C. Scott |
| Counsel for Appellant: | Fieldslaw, Gary D. Fields, Arlette B. Bolduc |
| | Esner, Chang & Boyer, Stuart B. Esner, Holly N. Boyer |
| Counsel for Respondents: | Gordon & Rees, S. Mitchell Kaplan, Don Willenburg, Gregory J. Gangitano |

A132555, *Brisbane Lodging, L.P. v. Webcor Builders, Inc.*