ACCEPTED
14-15-00061-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
11/9/2015 2:31:43 PM
CHRISTOPHER PRINE
CLERK

# IN THE COURT OF APPEALS
# FOR THE FOURTEENTH DISTRICT OF TEXAS
## AT HOUSTON

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS

11/9/2015 2:31:43 PM
CHRISTOPHER A. PRINE
Clerk

### NO. 14-15-00061-CV

## B. MAHLER INTERESTS, L.P.,

### Appellant,

## V.

## DMAC CONSTRUCTION, INC.

### Appellee.

**On Appeal from the 152nd Judicial District Court
Harris County, Texas
The Honorable Robert Schaffer Presiding, Cause No. 2012-64035**

## APPELLANT'S AMENDED BRIEF

**Jeffrey J. Tompkins**
SBT No. 20125500
1413 Brittmoore Road, Suite 108
Houston, TX 77043-4005
Telephone: 713-787-5333
Facsimile:  713-787-5334

i

**OF COUNSEL:**
**Christopher D. Nunnallee**
SBT No. 24025568
1413 Brittmoore Road, Suite 113
Houston, TX 77043-4005
Telephone: 713-787-5333
Facsimile: 713-787-5334

**ATTORNEYS FOR APPELLANT**

# IDENTITY OF PARTIES AND COUNSEL

**Plaintiff-Appellee:**
DMAC Construction, Inc.

**Defendant-Appellant:**
B. Mahler Interests, L.P.

**Trial/Appellate Counsel for Defendant-Appellant:**
Jeffrey J. Tompkins
SBT No. 20125500
1413 Brittmoore Road, Suite 106
Houston, Texas 77043-4005
Telephone: 713-787-5333
Facsimile: 713-787-5334
OF COUNSEL:
Christopher D. Nunnallee
SBT No. 24025568
1413 Brittmoore Road, Suite 113
Houston, Texas 77043-4005
Telephone: 713-787-5333
Facsimile: 713-787-5334

**Trial Counsel for Plaintiff/Appellee DMAC Construction, Inc.:**

James A. Schuelke
Reynolds Frizzell, LLP
1100 Louisiana Street, Suite 3500
Houston, Texas 77002
Telephone: 713-485-7200
Facsimile: 713-485-7250

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................... iii

TABLE OF CONTENTS ................................................................................ iv-v

INDEX OF AUTHORITIES ........................................................................... xi-x

STATEMENT OF THE CASE ........................................................................ xi

ISSUES PRESENTED ................................................................................... xii

STATEMENT OF FACTS ................................................................................ 1

A.     Factual Background ...................................................................... 1-12

B.     Procedural History .................................................................... 12-14

SUMMARY OF THE ARGUMENT ............................................................ 15-16

ARGUMENT ................................................................................................. 17

ISSUE ONE ................................................................................................... 17

I.     The Trial Court Erred in Granting DMAC's No-Evidence Motion
for Summary Judgment Because it Lacks Specificity ............................ 17-18

ISSUE TWO ................................................................................................... 18

II.     The Trial Court Erred Because DMAC Failed to Assert
Fraudulent Concealment Relating to the Porches As Grounds In
Its Motion ............................................................................................ 18-23

ISSUE THREE ............................................................................................... 23

III.     The Trial Court Erred In Granting DMAC's Traditional
Motion for Summary Judgment on Mahler's Defense of the
Discovery Rule ......................................................................................... 23

     A.     Standard of Review ..................................................................... 24

B.     The DMAC failed to negate the Discovery Rule under Article 13.7 of the Contract Because Mahler was Unsophisticated and Not Represented by Counsel ..................................................... 25-30

C.     Article 13.7.1.2 did not negate the Discovery Rule Pursuant to Texas public policy ...................................... 30-33

D.     Under the Discovery Rule, Mahler's Causes of Action Accrued No Sooner than May 22, 2012 ............................... 33-34

     1.    Porch Roofs ........................................................... 34-39

     2.    Floors ..................................................................... 39-44

ISSUE FOUR ........................................................................................ 45

IV.   The Trial Court Erred In Granting DMAC's Motion for Summary Judgment on Mahler's Defense of Fraudulent Concealment ........................ 45

A.     Standard of Review ........................................................... 45

B.     A Fact Question Exists on the Elements of Fraudulent Concealment Challenged by DMAC .......................................... 45

     1.    Mahler's reasonable diligence is a fact question ................ 45-53

     2.    DMAC's Purposeful Concealment Argument is Procedurally Defective and Raises A Fact Question ................................ 53-56

C.     Fraudulent concealment and "equitable estoppel" preserve Mahler's claims pertaining to the doors and floors ...................................... 56-60

PRAYER ........................................................................................... 61

# INDEX OF AUTHORITIES

## CASES

*American Tobacco Co. v. Grinnell,*
    951 S.W.2d 420, 425 (Tex. 1997) ................................................................ 24

*Bayou Bend Towers Council of Co-Owners v. Manhattan Const. Co.,*
    866 S.W2d 740, 742 (Tex. App.---Houston [14th Dist.]
    1993, writ denied) ....................................................................... 33-34

*Bandera Elec. Coop. v. Gilchrist,*
    945 S.W.2d 336, 337 (Tex. 1997) .............................................................. 20

*Booker v. Real Homes, Inc.,*
    103 S.W.3d 487, 494 (Tex. App.---San Antonio
    2011, pet. denied) .............................................................................. 55, 57

*BP America Production Co. v. Marshall,*
    342 S.W.3d 59, 67, (Tex. 2011) ............................................... 47-48, 53, 60

*Brisbane Lodging, L.P. v. Webcor Builders, Inc.,*
    216 Cal. App. 4th 1249, 1260 (Cal. Ct. App. 2013) ............................. 25-27

*Borderlon v. Peck,*
    661 S.W.2d 907, 909 (Tex. 1983) .................................................... 46-47, 53

*Chessher v. Southwestern Bell Tel. Co.,*
    658 S.W.2d 563, 564 (Tex. 1983) .............................................................. 20

*City of the Colony v. North Tex. Mun. Water Dist.,*
    272 S.W.3d 699, 730 (Tex. App.---Fort Worth 2008, pet. dism'd) .............. 35

*College of Notre Dame of Maryland, Inc. v. Morabito Consultants, Inc.,*
    132 Md.App. 158 (Md.App.2000) ....................................................... 29, 31

*Cherry v. Victoria Equip. & Supply, Inc.,*
    645 S.W.2d 781, 782 (Tex. 1983) .............................................................. 47

*DiGrazia v. Old,*
     900 S.W.2d 499, 503 (Tex. App.---Texarkana 1995, no writ) ..................... 54

*Earle v. Ratliff*
     998 S.W.2d 882, 888-89 (Tex. 1999) ......................................................... 54

*Exxon Corp. v. Emerald Oil & Gas Co.,*
     348 S.W.3d 194, 202 (Tex. 2011)...................................................... 46, 48

*Estate of Stonecipher v. Estate of Butts,*
     591 S.W.2d 806, 809 (Tex. 1979)................................................................ 60

*Etan Indus., Inc. v. Lehmann,*
     359 S.W.3d 620, 623 (Tex. 2011) (per curiam)........................................... 47

*FM Props. Operating Co. v. City of Austin,*
     22 S.W.3d 868, 872 (Tex. 2000) ................................................................. 24

*G&H Towing Co. v. Magee,*
     347 S.W.3d 293, 297 (Tex. 2011) .............................................................. 20

*Goswami v. Metropolitan S&L Ass'n,,*
     751 S.W.2d 487, 490 (Tex. 1988) .............................................................. 21

*Hogget v. Brown,*
     971 S.W.2d 472, 487 (Tex. App.---Houston [14th Dist.] 1997,
     pet. denied) ......................................................................................... 46, 55

*Horizon/CMS Healthcare Corp. v. Auld,*
     34 S.W.3d 887, 897 (Tex. 2000)................................................................. 22

*Hurlbut v. Gulf Atl. Life Ins. Co.,*
     749 S.W.2d 762, 766 (Tex. 1987)............................................................... 47

*Johnson v. Rollen,*
     818 S.W.2d 180, 183 (Tex. App.---Houston [1st Dist.] 1991, no writ) ...... 20

*Kerlin v. Sauceda,*
     263 S.W.3d 920, 926 (Tex. 2008)............................................................... 48

*Mafrige v. Ross.*,
866 S.W.2d 590, 591 (Tex. 1993) ................................................................ 21

*McConnell v. Southside Ind. Sch. Dist.*,
858 S.W.2d 337, 341 (Tex. 1993) ..................................................... 15, 19-20

*Mitchell Energy Corp. v. Bartlett*,
958 S.W.2d 430, 442 (Tex. App.---Fort Worth
1997, pet denied) .................................................................................. 46, 51-52

*Mooney v. Harlin*,
622 S.W.2d 83, 85 (Tex. 1981) .................................................................. 50

*Moreno v. Sanchez*,
106 Cal. App. 4th 1415, 1424, 131 Cal. Rptr. 2d 684 (2003) .................. 28-29

*Moreno v. Sterling Drug, Inc.*,
787 S.W.2d 348,351 (Tex. 1990) .............................................................. 33

*Oriskany Central School District v. Edmund J. Booth Architects, A.I.A*,
615 N.Y.S2d 160, 206 A.D.2d896 (1994) .................................................. 31

*Ortiz v. Collins*,
203 S.W3d 414 (Tex. App.---Houston [14th Dist.] 2006, pet. denied) ........ 17

*Page v. Geller*,
941 S.W.2d 101, 102 (Tex. 1997) .............................................................. 20

*Quick v. City of Austin*,
7 S.W.3d 109, 116 (Tex. 1998) .................................................................. 24

*Roark v. Allen*,
633 S.W.2d 804, 809 (Tex. 1982) .............................................................. 22

*Rhone-Poulenc, Inc. v. Steel*,
997 S.W.2d 217, 224 (Tex. 1999) .............................................................. 24

*Ruebeck v. Hunt,*
      176 S.W.2d 738, 739 (Tex. 1943)......................................................... 46-47

*Sci. Spectrum, Inc. v. Martinez,*
      941 S.W.2d 910, 911 (Tex. 1997) .......................................................... 24

*Shah v. Moss,*
      67 S.W.3d 836, 841 (Tex. 2001)......................................................... 46-47

*Shell Oil Co. v. Ross,*
      356 S.W.3d 924, 930 (Tex. 2011)............................................................ 48

*Sherman v. Sipper,*
      152 S.W.2d 319, 321 (Tex. 1941)............................................................ 48

*Southwestern Elec. Power Co. v. Grant,*
      73 S.W.3d 211, 215 (Tex. 2002) ............................................................. 24

*Specialty Retailers, Inc. v. Fuqua,*
      29 S.W.3d 140, 2000 WL 675127, at *5 (Tex. App.---Houston
      [14th Dist.] 2000, no pet. h.)...................................................... 15, 19-20

*S.V. v. R.V.,*
      933 S.W.2d 1, 6 (Tex. 1996)............................................................ 46, 53

*Tenowich v. Sterling Plumbing Co., Inc.,*
      712 S.W.2d 188, 189-90 (Tex.App.---Houston [14th Dist.]
      1986, no writ).......................................................................... 34, 44

*Timpte Indus. v. Gish,*
      286 S.W.3d 306, 310 (Tex. 2009) ....................................................... 15, 17

*Velsicol Chem. Corp. v. Winograd,*
      956 S.W.2d 529, 530 (Tex. 1997) ............................................................ 33

*Villages of Greenbriar v. Torres,*
      874 S.W.2d 259, 264(Tex. App.---Houston [1st Dist.]
      1994, writ denied).......................................................................... 59

*William L. Lyon & Associates, Inc. v. Superior Court,*
204 Cal.App.4th 1294 (2012) ................................................................. 31-32

*Weaver v. Highlands Ins. Co.,*
4 S.W.3d 826, 829 n.2 (Tex. App.---Houston [1st Dist.]
1999, no pet.)........................................................................................ 17-18

## RULES

TEX. R. CIV. P. 45(b)
(Vernon's Supp. 2015)............................................................................ 23

TEX. R. CIV. P. 166a(c)
(Vernon's Supp. 2015)....................................................................... 19, 24

TEX. R. CIV. P. 166a(i)
(Vernon's Supp. 2015)............................................................................ 17

TEX. CIV. PRAC. & REM. CODE §16.009(a), (e)(3)
(Vernon's Supp. 2015).................................................................. 1, 31, 33

TEX. GOV'T CODE ANN. §1001.056
(Vernon's Supp. 2015) ........................................................................... 49

Justice Michol O'Connor, O'Connor's Texas Rules: Civil Trials
2012 §6.6 (2012)...................................................................................... 19

# STATEMENT OF THE CASE

*Nature of the Case*: This case is about a bad contractor who intentionally provided substandard doors, floors, and framing in connection with the construction of an event center and recreation hall (wedding venue) in Katy, Texas. (CR 1:6-12; SCR 2:6-7, ¶4.).

*Course of Proceedings*: DMAC filed Motions for Summary Judgment asserting the statute of limitations barred both Mahler's claims. (CR 1:66-77; 135-149). Mahler asserted the counter-affirmative defenses of the discovery rule, fraudulent concealment, and estoppel. (CR 1:10-11).

*Trial Court's Disposition of Case*: The trial court granted DMAC's motions for final summary judgment by signed order on October 17, 2014. (SCR 1:4-5). Notably, it did so notwithstanding DMAC's fraudulent concealment of the nature of the doors and floors installed, as well as latent defects built into the structure of the porch framing (SCR 2:6-7, ¶4).

# ISSUES PRESENTED

1. Whether the trial court erred in granting DMAC's No Evidence Motion for Summary Judgment because the motion fails to specifically challenge one or more elements of any cause of action asserted by Mahler in Plaintiff's Original Petition.

2. Whether the trial court erred in granting DMAC's Traditional Motion for Summary Judgment because the court granted more relief than requested in DMAC's motion.

3. Whether the Trial Court Erred In Granting DMAC's Traditional Motion for Summary Judgment because DMAC failed to conclusively negate the discovery rule.

4. Whether the Trial Court Erred In Granting DMAC's Traditional Motion for Summary Judgment because Mahler raised a genuine issue of material fact on each element of fraudulent concealment.

## II.

## STATEMENT OF FACTS

This case involves the intentional building and installation of latent construction defects, which through DMAC's later misrepresentation and concealment, resulted in Mahler filing this lawsuit beyond the prescribed four-year statute of limitations.

However, even if Mahler had *not* discovered the nature of its injuries within ten years after substantial completion (which it did), the ten-year Statute of Repose would not have barred Mahler's claims because of DMAC's fraudulent concealment of the defects existing in the doors, the floors, and the porch framing.1

### A.    Factual Background

Mahler hired DMAC as the general contractor for the construction of an event center and reception hall called Briscoe Manor (the "Project") now located and doing business in Katy, Texas (CR 1:14-18). The parties signed the contract on November 29, 2005, and DMAC agreed to a contract sum of $1,368,516.00 (CR 1: 14-15, ¶4.1). DMAC started construction of the Project in January 2006 (CR 66-67, ¶2).

---

1It is Texas law that regardless whether a plaintiff actually discovers an injury within ten years, a claim brought due to damage "arising out of a defective or unsafe condition of the real property or a deficiency in the construction or repair of the improvement," must be brought no later than 10 years after the construction is substantially complete, unless the action is "based on willful misconduct or fraudulent concealment in connection with the performance of the construction or repair." TEX. CIV. PRAC. & REM. CODE §16.009(a), (e)(3) (Vernon's Supp. 2015).

On October 25, 2006, the parties signed the Certificate of Substantial Completion (CR 1:89). According to that document, DMAC agreed to a list of items to be completed or corrected but the list is not attached (CR 1:89; 161). DMAC performed punch-list item work during the end of 2006 and for much of the 2007-year and into the early portion of the 2008-year (CR 1:151, ¶4; SCR 2:29-32).

The following provisions of the AIA Document A201-1997 and entitled, *General Conditions of the Contract for Construction*, are pertinent to this dispute, to-wit:

**3.3 SUPERVISON AND CONSTRUCTION PROCEDURES**
**3.3.1** The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract.

**3.5 WARRANTY**
**3.5.1** The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and the Work will conform to the requirements of the Contract Documents.

**3.7 PERMITS, FEES AND NOTICES**
**3.7.4** If the Contractor performs Work knowing it to be contrary to laws, statutes, ordinances, building codes, and rules and regulations without such notice to the Architect and Owner, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction.

**12.2**      **CORRECTION OF WORK**
**12.2.1**      **BEFORE OR AFTER SUBSTANTIAL COMPLETION**
**12.2.1.1**      The Contractor shall promptly correct Work rejected by the Architect or failing to conform to the requirements of the Contract Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspection and compensation for the Architect's services and expenses made necessary thereby shall be at the Contractor's expense.

On August 17, 2007, Mahler hired a licensed professional inspector, Edward Robinson (SCR 2:29, ¶4).2 Robinson conducted an inspection and prepared a property condition report (CR 1:91-118). The Robinson report did not disclose that the doors were rated as interior grade doors not suited for use at exterior locations (CR 1:113-118; SCR 2:15).3 It also didn't disclose that the floors were manufactured and rated for residential use only and not commercial grade designed for higher traffic (ballroom dancing), higher loads (crowds), and higher abrasion occurrences (tables, carts, chairs, etc.) than residential floors (CR 1:113-118; SCR 2:15). Rather, it merely disclosed existing and visible property defects at the time of the inspection. *Id.*

DMAC argued below that the following comment in the Robinson report about the porches disclosed structural defects with the roof and soffit below that

---

2Robinson is licensed as a mechanical engineer only (SCR 2:10, ¶1).

3The Robinson report did note "[i[t was indicated that there was *concern* that the wood exit doors from the buildings were not intended for exterior use" (CR 1:114, ¶18) (emphasis added). However, DMAC's representative later assured Mahler that the doors were appropriate for a commercial setting (SCR 2:82, ¶3).

area for the entire porch roofs running approximately 114' long protecting an outdoor patio along the east face of the ballroom, a similar porch roof along the west side of the ballroom, and continuing along the north side of the offices and over the chapel, to-wit:

> The surface of the roof at the east porch off the reception building was uneven, which corresponded to sags and unevenness at the ceiling below this area. There was significant sag observed over the barbeque area outside the bar which was abnormal and *may* be due to *structure of insufficient stiffness* to prevent the sag. It is recommended that these irregularities *be further investigated by the builder* to determine the extent of reinforcement necessary for the *ceiling structure* to prevent further unevenness or deflections.

(CR 1:103; SCR 2:14, ¶2) (emphasis added).

Consistent with the report noting that the sags and unevenness "*may be due to structure of insufficient stiffness,*" Robinson recommends that DMAC perform its own inspection to determine "the extent of reinforcement *necessary*" to prevent further unevenness or deflections" and highlights that "inspection for ... *latent* defects in the roof ... is beyond the scope of this inspection" (CR 1:101, ¶C; 103, ¶5; ). Robinson neither performed nor was he qualified to perform the tests necessary to detect structural defects.

> This inspector has not been trained to detect such materials, and *no tests were performed to discover any latent defects* in the inspected items including the foundation, *structure, roof,* or maintenance of the building that may become evident in the future with normal use of the building.

(CR 1:101, ¶C) (emphasis added).

- 4 -

On October 24, 2007, Mahler contacted Roger Tornga of DMAC by email inquiring about Bob Cooper's failure to respond to Mahler's requests to make a schedule for repairs of the items identified in the Robinson report (SCR 2: 77). Mahler made a nonexclusive list of specific "outstanding items" and said the following about the porches: "The ceiling under the porches was put up using *staples* and is starting to have a wave look and has come apart in some areas. *Needs to be screwed in.*" (SCR 2: 29-30, ¶4) (emphasis added).4

On or about December 1, 2007, DMAC sent a daily worker to the Project who installed screws into the soffits and then caulked and painted over them (SCR 2: 30, ¶6). On December 8, 2007, in an email to Roger Togna, Mahler stated the soffits have a "wave-look" to them and "were to be corrected." *Id.* On December 17, 2007, DMAC's on site superintendant, Bob Cooper, sent an email responding, in part, to Mahler's concerns, to-wit:

Hi Jorden,

I have a contractor that would like to look at the soffit at Briscoe in order to know exactly what his crew will need when they start after the first. Are you all open this week where he could look at it? Please let me know.

Thanks,

Bob

---

4Mahler's observation that the porch ceilings were secured to the rafters by using staples and *needed to be screwed in* evidence that he was unaware of the structural nature of the defects in the porch framing (SCR 2: 77) (emphasis added).

(SCR 2:30, ¶7).

On December 28, 2007, Cooper later sent a second email to "clear the air about a couple of items that you sent to Roger" (SCR 2: 82, ¶1). Cooper then explained the repairs done to the soffits of the porch roofs and recommended one of two options to complete the repairs:

> • The hardiplank ceiling covering ... has been tightened up using counter-sunk screws and caulked. Due to the nature of this material, we have two options. First, we can finish filling the screw heads flush with caulk and then paint, or secondly, we can 'feather float' with ceiling texture and paint which will help hide the joints. Your comment to one of the subcontractors about wanting it to look like 'glass' makes me feel that you will be much happier with the secondary option. I need to know which option you wish to go ahead with before I schedule the painter.

(SCR 2: 82-83, ¶5). DMAC never recommended an investigation deeper into the structure of the porches to identify latent defects or structure of insufficient stiffness as the cause to the sags and unevenness at the soffits below the porch roofs ("entire record").

Mahler elected the second option, the application of a joint compound to the exterior of the soffits as the means to repair the sags and unevenness in the porch roofs (SCR 2: 30, ¶8). Not knowing any better, Mahler thought the results "looked great" for the next several years (SCR 2: 30, ¶9). In fact, Cooper told Mahler "that there were no structural concerns in the Robinson report or as a result of DMAC's subsequent inspections of the porch roofs and ceilings." *Id.* DMAC's

representatives told Mahler that the porch roofs and ceilings had been fixed. *Id.* As recently as July 14, 2014, during the course of his oral deposition in this case, DMAC's principal and owner, Don F. McIntyre, testified that the defects had been "fixed." (SCR 2: 94, p.41:8-10).

Unfortunately for Mahler, matters continued to get worse. In approximately Fall 2010, the flooring in the reception hall began to show signs of wear and tear and by the 2011-year had deteriorated to the point that Mahler replaced the flooring in the ballroom (SCR 2: 30-31, ¶10). The flooring in the Chapel building has yet to be replaced. In May 2011, the installer of the new floors in the ballroom inquired why Mahler had installed residential flooring. *Id.* At that same time, Mahler contacted the manufacturer and confirmed the residential grade of the flooring installed by DMAC and discovered that the seven-year warranty was voided upon installation. *Id.* Thereafter, Mahler contacted Lance McIntyre of DMAC and told him about the floors and McIntyre stated that "You know we were on a tight budget" and he asked whether Mahler intended to sue DMAC over the defective construction. *Id.*

Mahler later learned that it would have been more expensive for DMAC to install commercial grade floors and exterior grade doors at the Project (SCR 2: 31, ¶12). Mahler paid the $1,368,516.00 stipulated in the contract for the Project. *Id.* About one year into the Project, DMAC requested a change order to increase the

contract price by $355,000.00 for a total contract price of $1,723,516.00. *Id.* Mahler paid it. *Id.*

In April 2012, Mahler noticed a portion of the soffit detaching from the structure of the porches (SCR 2: 30, ¶9). This was the first sign of structural defects Mahler had seen with the soffits since DMAC made its repairs in December 2007. *Id.* In May 2012, Mahler obtained a second professional inspection focused on the doors, the floors, and the porches (SCR 2: 31, ¶11). Mahler hired a structural engineer, Steven Schilder of SMS Engineering, to perform the inspection. *Id.* After conducting his inspection, Schilder's report notes that (1) the doors are deteriorating due to exterior use and are an interior grade door and not suitable for exterior locations, (2) the flooring material is residential grade and installed in a commercial application, and (3) the porch roofs and ceilings suffer from multiple structural defects that were originally built into the framing by DMAC (SCR 2: 8-28).

Schilder's report on the condition of the structure of the porch roofs and soffits is startling (SCR 2: 8-28). DMAC constructed a facility for Mahler that falls into a category that must be designed by a structural engineer (SCR 2: 17, ¶2). DMAC did not retain or use a structural engineer in connection with the Project (SCR 2: 6, ¶4).5 Schilder reports that the porch roof deficiencies were structural in

_____

5According to DMAC's owner, Don McIntyre, an engineer was not required (SCR 2: 89, p.22:

nature, not visible, and included the following: (1) in adequate and improper connection of rafters to columns; (2) no beam supports between columns supporting exterior ends of rafters; (3) undersized rafters for span; (4) excessive rafter spacing; and (5) inadequate and improper connection of rafter top end to nailer plate (SCR 2: 14, ¶5). In fact, Schilder noted that DMAC's application of the interior grade compound to texture the underside of the porch soffit was done to mask the inadequate and insufficient nailing of soffit material (Hardi-Board) to the underside of the rafters (SCR 2: 9, ¶3biii; 14, ¶4). As confirmed by Barry Tarver's affidavit later (SCR 2: 6, ¶4), Schilder correctly opined that the structural defects with the porches existed at the time of the construction and were built into the structure of the porch roofs (SCR 2: 10, ¶2). As Schilder notes, "[t]he numbers tell us what our eyes are seeing; that the framing is near to failure under its own weight" (SCR 2: 16, ¶3). However, not even Schilder, a professional structural engineer, could confirm the extent of the structural defects with the porch roofs, and opined that based on the extent of "the widespread substandard construction observed at the visible areas of the porch roof, I suspect that other issues may exist deeper in the structure" (SCR 2: 16, ¶4). Mahler certainly didn't discover the nature of the injury with the doors, the floors, and the porch roofs until after reading Schilder's report (SCR 2: 29-32).

---

12-23).

As stated by Jorden Mahler, "the issue with the doors was a different story" (SCR 2: 31, ¶11). On April 9, 2007, Mahler contacted the manufacturer of the doors, VT Industries, and requested the detail and spec sheets for the doors DMAC installed (CR 1: 196). Mahler also mentioned that the veneer had separated from the wood in certain locations. *Id.* VT Industries representative, Janet Richter, responded to Mahler's request and informed him that any doors hung in a exterior application carry no warranty. *Id.* In fact, the detail and spec sheets provided to Mahler provided that same information but didn't disclose that the doors DMAC installed were rated as interior grade doors and not suitable for use at exterior locations (CR 1: 197-201).

At the time of the Robinson inspection four months later, Mahler expressed *concern* to Robinson that the doors were not intended for exterior use (SCR 2: 114, ¶18). However, according to the report, Robinson did not substantiate Mahler's concern and, in fact, Robinson noted that the doors "appeared to perform satisfactorily" and that an exterior grade weather resistant finish had been applied to the doors, which also "appeared to be performing satisfactorily" at the time of the inspection. *Id.*

However, DMAC knew from the beginning that the warranty for the doors was void upon installation because the doors DMAC installed were rated only for interior use (CR 1: 196). According to Schilder, the doors supplier confirmed by

- 10 -

letter that DMAC was aware of that fact prior to installation of the doors at the Project (SCR 2: 8).

Mahler repeatedly inquired of DMAC about the doors and he was consistently assured it was appropriate to install the doors for an exterior application (SCR 2: 31, ¶11). On December 8, 2007, Mahler asserted in the email to Roger Tornga that DMAC had hung doors rated for only interior use at Briscoe Manor (SCR 2: 79). However, on December 28, 2007, Cooper reassured Mahler that the doors were entirely appropriate for exterior use and the issue was put to rest for the next several years.

> • You continually keep bringing up the exterior doors, time and time again, thus labeling them 'interior doors.' Do you or Bill have P-lam or metal doors on any or all of your doors at your home? Of course not, they are wood! Solid wood doors that are sealed and either painted or stained and varnished properly are *used as "Exterior Doors" as well as metal or glass doors.* If these doors were hollow core doors, that would be different. They are not! If you remember, we bought heavy duty *marine* varnish to add over the manufacture's coat *for longer protective measures.* So your decision to take our check 'back to the bank' because of your perceived 'scenario, and being mislead about the doors' comes across to me as being a very inappropriate decision on your part!

(SCR 2: 82, ¶4). Cooper and other DMAC representatives continuously told Mahler from the start of the construction that the doors would be fit for Mahler's commercial purpose (SCR 2: 31, ¶11).

However, according to the Schilder report dated May 22, 2012, the wood stile doors with glass panels installed at the exterior locations at Briscoe Manor are

interior grade doors (SCR 2: 15). Schilder noted in the report that doors are rated by a number of agencies including the Window and Door Manufactures Association (WDMA). *Id.* According to documentation provided by the door supplier and confirmed by the door manufacturer, VT Industries, the door type purchased and installed by DMAC are a style SS3151 OVOLO, which are rated for interior use only. *Id.*

## B.    Procedural History

On October 26, 2012, Mahler filed Plaintiff's Original Petition asserting causes of action for breach of contract and breach of warranty in connection with the defects with the doors, the floors, and the porches. Mahler also asserted the counter-defenses of the discovery rule, fraudulent concealment, and equitable estoppel (CR 1: 6).

On July 18, 2014, DMAC filed Defendant's Amended Traditional and No-Evidence Motion for Summary Judgment (CR 1: 135). DMAC moved for summary judgment its defense of limitations (CR 1: 136-137). DMAC only sought to negate the defenses of estoppel and fraudulent concealment as it related to the doors and floors (CR 1: 145). The motion did not seek to negate fraudulent concealment as it related to the porches. *Id.* DMAC also sought to negate the discovery rule as it related to the doors, the floors, and the porches. *Id.*

- 12 -

On August 1, 2014, Mahler filed Plaintiff's Response to Defendant's Traditional & No-Evidence Motion for Summary Judgment (CR 1: 264). Mahler also filed its Appendix of Evidence (SCR 2: 3-84).

On August 7, 2014, DMAC filed its Reply to Mahler's Response to DMAC's Amended Motion for Summary Judgment (CR 1: 279). In the Reply, DMAC sought to negate Mahler's defense of fraudulent concealment as it related to the porches (CR 1: 287-290). Also on August 7, 2014, out of an abundance of caution, Mahler filed Plantiff's First Amended Petition clarifying that it was asserting fraudulent concealment in connection with the porches (CR 1: 303-04). Mahler also sought leave of the trial court for the filing of the amended petition and set the motion on the trial court's submission docket (SCR 3: 3-5, 8). Although proposed orders were filed, the trial court never denied Mahler's motion (SCR 3: 9). DMAC filed a written objection (CR 1: 307).

On August 8, 2014, the trial court considered DMAC's Amended Motion for Traditional and No-Evidence Motion for Summary Judgment. During the oral hearing, the trial court orally denied DMAC's no-evidence motion for summary judgment (CR 1: 310, f.n.1).

On August 14, 2015, Mahler filed Plaintiff's Sur-Response to DMAC's Reply (CR 1: 310). Mahler also filed Plaintiff's Motion for Leave to File Late Summary Judgment Evidence in connection with Plaintiff's Sur-Response (SCR 2:

- 13 -

107-114).

On August 26, 2015, the trial court signed an Order Granting Plaintiff's Motion for Leave to File Late Summary Judgment Evidence (SCR 2: 115). Accordingly, the Affidavit of Jordan Mahler and attached exhibits conclusively establish that Mahler was unsophisticated in construction, that Mahler had no legal counsel in connection with the executed contract with DMAC (which was an adhesion contract), and that DMAC failed to correct its work in accordance with Article 12 of the Contract.

On October 17, 2014, the Court signed an order granting DMAC's Amended Traditional and No Evidence Motion for Summary Judgment (SCR 1: 5). At that time, DMAC's counterclaim, previously filed on September 5, 2014, was still pending before the trial court (CR 1: 330).

On April 27, 2015, DMAC non-suited its counterclaim (SCR 1: 3).

On May 5, 2015, the trial court signed a clarifying Order stating that its October 17, 2014, Final Summary Judgment is now a final and appealable judgment (SCR 1: 4-5).

## SUMMARY OF THE ARGUMENT

Mahler's first argument is that the trial court erred in granting DMAC's No-Evidence Motion for Summary Judgment because the motion lacks specificity as required by Civil Rule 166(a)(i). *Timpte Indus. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009).

Mahler's second argument is that the trial court erred in granting DMAC's traditional motion for summary judgment because, again, it lacks specificity. DMAC used its Reply to assert fraudulent concealment as it related to the porches as one of DMAC's "grounds" for summary judgment. Allowing the Reply to provide the requisite specificity would be in violation of the Texas Supreme Court's insistence that a motion for summary judgment must "stand or fall on the grounds expressly presented in the motion." *See McConnell v. Southside Ind. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) (motion that fails to present grounds is legally insufficient as a matter of law); *see also Specialty Retailers, Inc. v. Fuqua*, 29 S.W.3d 140, 2000 WL 675127, at *5 (Tex. App.---Houston [14th Dist.] May 25, 2000, no pet. h.) (challenges must be presented in motion)..

Mahler's third argument is that the trial court erred in granting DMAC"s traditional motion for summary judgment because DMAC failed to negate the discovery rule by mean of the contractual accrual provision because Mahler was unsophisticated, not represented by counsel, and DMAC is guilty of fraudulent

- 15 -

concealment of the construction defects. Moreover, the accrual of Mahler's causes of action are deferred under the discovery rule because the nature of Mahler's injury is inherently undiscoverable and objectively verifiable.

Mahler's' fourth argument is the trial court erred in granting DMAC's traditional motion for summary judgment on Mahler's claim for fraudulent concealment because the motion did not move for summary judgment on that ground and the trial court granted more relief that was requested. Moreover, Mahler raised a fact question on reasonable diligence and DMAC's purposeful concealment.

## ARGUMENT

## ISSUE ONE

I. **The Trial Court Erred In Granting DMAC's No-Evidence Motion for Summary Judgment because it Lacks Specificity.**

At the oral hearing conducted on August 8, 2014, the trial court orally announced that DMAC's no-evidence motion was denied because it did not satisfy the specificity requirement under Civil Rule 166a(i) (CR 1: 118, f.n. 1). However, in the Final Summary Judgment, signed on October 17, 2014, the trial court "ORDERS that Defendant's Amended Traditional and *No-Evidence Motion* for Summary Judgment should be and hereby is GRANTED" (CR 1:349) (Emphasis added).

A no evidence motion for summary judgment must state that there is no evidence to support one or more specific elements of a claim or defense on which the nonmovant has the burden of proof at trial. TEX. R. CIV. P. 166(a)(i); *Timpte Indus. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The motion cannot be conclusory or generally allege that there is no evidence to support the non-movant's claim or defense. *Id.*; *see also Ortiz v. Collins*, 203 S.W.3d 414, 425 (Tex. App.---Houston [14th Dist.] 2006, pet. denied). When a no-evidence motion for summary judgment does not challenge specific elements, it should be treated as a traditional motion for summary judgment under Civil Rule 166a(c), which imposes the burden of proof on the movant. *See Weaver v. Highlands Ins. Co.*, 4

S.W.3d 826, 829 n.2 (Tex. App.---Houston [1st Dist.] 1999, no pet.).

In the instant case, DMAC's motion for summary judgment is entitled "Defendant's Amended Traditional and No-Evidence Motion for Summary Judgment." (CR 1: 135). In Plaintiff's Original Petition, Mahler asserted causes of action for breach of contract and breach of warranty. (CR 1: 9-10). However, DMAC's motion did not assert no-evidence in connection with one or more elements associated with Mahler's causes of action (CR 1: 135-149). In fact, the motion is void of any section or paragraph related to any request for a no-evidence motion for summary judgment on either breach of contract or breach of warranty. *Id.* Rather, DMAC's motion is entitled, in part, as "Defendant's . . . No-Evidence Motion for Summary Judgment," and the words "no-evidence" are never again asserted in the motion. *Id.*

Accordingly, as to DMAC's No-Evidence Motion for Summary Judgment, the trial court erred and the judgment should be reversed and remanded to the trial court for further proceedings.

## ISSUE TWO

**II.    The Trial Court Erred because DMAC failed to Assert Fraudulent Concealment relating to the Porches As "Grounds" in its Motion.**

DMAC's motion stated "Plaintiff's petition also asserts application of equitable estoppel and fraudulent concealment with respect to the claims pertaining to *the doors and floors.*" (CR 1: 145) (Emphasis added). The motion does not

address Mahler's claim of fraudulent concealment as it relates to the porch roofs (CR 1: 145-148). On August 7, 2014, DMAC filed a Reply and for the first time asserted new grounds for summary judgment relating to Mahler's claim of fraudulent concealment in connection with the porches (CR 1: 287-290). Specifically, DMAC asserts the following: "Neither the discovery rule *nor fraudulent concealment* can save Plaintiff's claims concerning the porch roofs." (CR 1: 290, ¶1) (emphasis added).

It is Texas law that the grounds for summary judgment must be stated "specifically" and "expressly set out in the motion." *See* TEX. R. CIV. P. 166a(c) (Vernon's Supp. 2015). Although DMAC asserts fraudulent concealment in connection with the porch framing in the Reply, DMAC's ability to use its Reply to provide the requisite specificity is procedurally defective. Allowing the specificity to be satisfied by DMAC's Reply allows a movant to avoid complying with the specificity requirement until the day before the summary judgment hearing or later. *See* Justice Michol O'Connor, O'Connor's Texas Rules: Civil Trials 2012 §6.6 (2012) (noting that rule 166a does not contain a deadline for a movant to file a reply to a non-movant's response). Furthermore, allowing the Reply to provide the requisite specificity would be in violation of the Texas Supreme Court's insistence that a motion for summary judgment must "stand or fall on the grounds expressly presented in the motion." *See McConnell v.*

*Southside Ind. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) (motion that fails to present grounds is legally insufficient as a matter of law); *see also Specialty Retailers, Inc. v. Fuqua*, 29 S.W.3d 140,, at *5 (Tex. App.---Houston [14[th] Dist.] May 25, 2000, no pet. h.) (challenges must be presented in the motion).

A summary judgment on a claim not addressed in the motion is generally reversible error. *G&H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011). When a summary judgment disposes of more claims than the motion requested, the appellate court should affirm the grounds on which the judgment was properly granted and reverse only those portions that are erroneous. *Id.* at 298; *Page v. Geller*, 941 S.W.2d 101, 102 (Tex. 1997); *e.g., Bandera Elec. Coop. v. Gilchrist*, 946 S.W.2d 336, 337 (Tex. 1997) (Plaintiff's motion for SJ did not address counterclaim).

DMAC did not amend its motion for summary judgment to address Mahler's fraudulent concealment claim as it relates to the defective porches ("entire record"). A summary judgment may not be granted, as a matter of law, on a cause of action not addressed in the summary judgment proceeding. *Chessher v. Southwestern Bell Tel. Co.*, 658 S.W.2d 563, 564 (Tex.1983); *Johnson v. Rollen*, 818 S.W.2d 180, 183 (Tex.App.--Houston [1st Dist.] 1991, no writ). Thus, the trial court erred in attempting to enter an all inclusive final summary judgment. Where the summary judgment purports to grant more relief than requested, an

- 20 -

appellate court must reverse and remand, rather than dismiss. *Mafrige v. Ross,* 866 S.W.2d 590, 591-92 (Tex.1993).

That is precisely the posture of this case. The trial court in granting the summary judgment motion, which was based only on DMAC's limitations defense, Mahler's counter-defense of fraudulent concealment and equitable estoppel relating to the doors and floors, and Mahler's counter-defense of the discovery rule related to the doors, the floors, and the porches, purported to dispose of all claims by Mahler against DMAC including fraudulent concealment in connection with porches (CR 1: 138-148). Since the summary judgment purported to be final, rather than partial, this Court must, in accordance with *Mafrige,* treat it so.

DMAC's counsel narrowly construed Mahler's petition to exclude fraudulent concealment in connection with the porches. Accordingly, out of an abundance of caution, Mahler amended its pleadings to clearly assert fraudulent concealment to cover the complaint with the porches before the hearing (CR 1: 303-304). Mahler also sought leave of court to file the amended pleading (SCR 3: 3-5). DMAC objected (CR 1: 307). However, the record does not reflect that the trial court denied leave to amend (SCR 3: 9). Therefore, this Court should assume Mahler's motion for leave was granted and that the trial court considered Mahler's amended pleading. *Goswami v. Metropolitan S&L Ass'n,* 751 S.W.2d 487, 490

(Tex. 1988). If a late amendment creates a fact question, the appellate courts will reverse the summary judgment. *Id.* at 491.

However, Mahler's original petition alleged fraudulent concealment in connection with the porches (CR 1: 6-12). It is Texas law that pleadings must only provide "fair notice" of a plaintiff's claims so that a defendant can prepare a defense. TEX. R. CIV. P. 45(b) (Vernon's Supp. 2015). When, as here, pleadings are not challenged by special exceptions, the court will construe them liberally in favor of the pleader. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 897 (Tex. 2000). The court will look to the pleader's intent and will supply every fact "that can reasonably be inferred from what is specifically stated." *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982).

Mahler's original petition begins with a factual summary section discussing the defects with the doors, the floors, and the porches (CR 1: 7-9). Mahler then asserts causes of action for breach of warranty and breach of contract and neither theory was restricted to any one of Mahler's factual complaints about the doors, the floors, or the porches (CR 1: 9-10). In fact, Mahler alleged that the defects with the doors, the floors, and the porches amount to both a breach of warranty and a breach of contract. *Id.*

Mahler used general language in the opening paragraphs under all three legal theories asserted to defer the accrual date on his causes of action for breach of

contract and breach of warranty. In the paragraph entitled, Fraudulent Concealment, Mahler asserts "the accrual period related to MAHLER's *causes of action* should be deferred until the date MAHLER learned of, or should have discovered, the deceitful conduct or facts giving rise to the *causes of action* asserted herein." (CR 1: 11) (emphasis added). Similarly, under the section entitled, Discovery Rule, "MAHLER asserts the discovery rule in connection with all of its *causes of action* asserted herein." (CR 1: 10) (emphasis added). In other words, Mahler sought to resuscitate all of its claims for breach of warranty and breach of contract as each theory related to the complaints about the doors, the floors, and the porches through the defenses of fraudulent concealment and the discovery rule.

Accordingly, as for the trial court's reliance on the Reply to assert Mahler's defense of fraudulent concealment as it related to the porch roofs as "grounds" for summary judgment, the trial court erred and the judgment should be reversed and remanded to the trial court for further proceedings.

### ISSUE THREE

**III. The Trial Court Erred in Granting DMAC's Traditional Motion for Summary Judgment on Mahler's Counter-Defense of the Discovery Rule.**

To prevail on its summary judgment motion, DMAC had to demonstrate that there were no genuine issues of material fact and that it was entitled to judgment as

- 23 -

a matter of law. *See* TEX. R. CIV. P. 166a(c) (Vernon's Supp. 2015); *American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex. 1997). Accordingly, DMAC had to (1) conclusively prove when the cause of action accrued, and (2) conclusively negate the discovery rule as a matter of law. *Rhone-Poulenc, Inc.,* 997 S.W.2d at 224.

## A. Standard of Review

On appeal, the trial court's summary judgment will be reviewed de novo. *See FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex. 2000). When reviewing error under a de novo standard, this Court has much discretion and conducts an independent analysis of the record to arrive at its own legal conclusions, does not defer to the trial court's conclusions, and may substitute its conclusions for those made by the trial court. *See Quick v. City of Austin,* 7 S.W.3d 109, 116 (Tex. 1998).

In reviewing the grant of a summary judgment, all evidence favorable to the non-movant must be taken as true and all reasonable inferences, including any doubts, must be resolved in the non-movant's favor. *See Southwestern Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex. 2002); *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex. 1997).

**B.**   **DMAC failed to negate the Discovery Rule under Article 13.7 of the Contract because Mahler was unsophisticated and not represented by counsel.**

DMAC sought to negate the discovery rule by means of Article 13.7.1.2 of the Contract (CR 1: 284). According to Article 13.7.1.2, "any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of issuance of the final Certificate for Payment (SCR 2: 74).[6] DMAC has cited to no Texas law enforcing this same language in the AIA standard form contract (CR 1: 284-85).

DMAC relies principally on *Brisbane Lodging, L.P. v. Webcor Builders, Inc.*, 216 Cal. App. 4th 1249, 1260 (Cal. Ct. App. 2013), for the proposition that paragraph 13.7.1.2 of the Ccontract abrogates, as a matter of law, the applicability of the discovery rule. First of all, *Brisbane Lodging*, as a matter of law, is only persuasive authority in Texas.

Second, as a matter of fact, paragraph 13.7.1.2 of the Contract cannot dictate the date of accrual in this case because the facts in *Brisbane Lodging* are distinguishable. In fact, in *Brisbane Lodging*, the California court of appeals

---

[6]Based on Article 13.7.1.2, DMAC must argue that Mahler's causes of action "shall be deemed to have accrued" no later than the date of the final Certificate for Payment for acts and omissions "occurring subsequent" to the "date of Substantial Completion and prior to issuance of the final Certificate for Payment." (SCR 2: 74).

emphasized a common thread among the jurisdictions cited by DMAC[7] that have enforced such accrual clauses

> Although we are *not* bound to follow these out-of-state authorities, they reflect a broad consensus as to the proper interpretation of the AIA's standard agreement's accrual provision under circumstances *identical* to the circumstances present in this case; that is, where the provision was freely entered into by parties *represented by legal counsel* engaged in a *sophisticated* commercial construction project.

*Brisbane Lodging, L.P. v. Webcor Builders, Inc.*, 216 Cal. App. 4th 1249, 1260 (Cal. Ct. App. 2013) (emphasis added). The trial court in *Brisbane Lodging* also emphasized the sophistication of the parties noting, "that the agreement was one between sophisticated parties seeking to define the contours of their liability." *Id.* at 1253.

In *Brisbane Lodging*, the parties entered into a contract for the design and construction of an eight-story hotel. *Brisbane Lodging*, 216 Cal. App. 4th at 1254. The appellate court noted that "[b]efore execution, the agreement had been extensively negotiated between the parties." *Id.* Five months before the parties executed the contract, Brisbane wrote the following to Webcor: "It is understood and agreed that negotiation of contract documents and satisfaction of customary closing conditions and due diligence must be satisfactory in form and substance to

---

[7]Contrary to DMAC's assertion that the California court "joined a long list of jurisdictions" that have enforced this AIA standard form provision, DMAC could only cite to five other states: Kentucky, Maryland, Massachusetts, New York, and Pennsylvania (CR 1: 284-85). Again, DMAC didn't cite to any Texas law on that issue. *Id.* Also, Mahler's counsel couldn't locate any Texas authority on that issue.

the parties and their respective counsel." *Id.* Both parties revised the contract by striking out unacceptable provisions and inserting additional terms. *Id.* Brisbane approved the form of the agreement with "mutually acceptable language." *Id.*

The *Brisbane Lodging* court also relied on other state law. Specifically, it noted "[p]arties represented by counsel have even been allowed to waive the protection of Civil Code section 1542, thereby giving up the right to bring suit on unknown and unsuspected claims at the time the contract is executed." *Brisbane Lodging*, 216 Cal. App. 4th at 1263. In rejecting the argument that in all cases involving latent defects limitations cannot begin to run until the defects were or should have been discovered, the California court again emphasized the sophistication of the parties

> Instead, we believe that where parties are on equal footing and where there was considerable *sophisticated give and take* over the terms of the contact, those parties should be given the ability to enjoy the freedom of contract and to structure risk-shifting as they see fit without judicial intervention.

*Id.* at 1263. It distinguished other cases where plaintiffs were unsophisticated in construction matters and emphasized that the parties in *Brisbane Lodging* "occupied positions of equal bargaining strength" and "had the commercial and technical expertise to appreciate fully the ramifications of agreeing to a defined limitations period" and that conclusion "is reinforced by the fact that both parties had the participation and advice of legal counsel during contract negotiations." *Id.*

at 1267 (*citing Moreno v. Sanchez*, 106 Cal. App. 4th 1415, 1424, 131 Cal. Rptr. 2d 684 (2003)).

In *Moreno v. Sanchez*, the California court of appeals reversed the trial court's dismissal of the plaintiffs' claim based on a one year contractual limitations period. *See Moreno v. Sanchez*, 106 Cal. App. 4th 1415, 1424, 131 Cal. Rptr. 2d 684 (2003). In doing so, the *Moreno* court acknowledged the proposition that parties to a contract may stipulate therein for a limitation period shorter than fixed by statute provided that the period fixed does not show imposition or undue advantage. *Id*. at 1430. Nevertheless, the court concluded that in order for a contractual agreement establishing an accrual date for lawsuits against home inspectors to be enforceable, a homeowners cause of action against a home inspector cannot commence to run from the date of inspection, but instead, had to run from the date the homeowner discovers, or with the exercise of reasonable diligence should have discovered, the breach. *Id*. at 1428-29.

The *Moreno* court based its ruling on the judicial concern toward protection of homeowners. *Moreno*, 106 Cal.App.4th at 1425. Throughout the court's opinion in *Moreno*, it emphasized the importance of the relationship between the parties, where the home inspector was a professional in possession of special skills and knowledge upon whom the homeowners relied completely for counsel and advice. *Id*. The court further reasoned that although the discovery rule originated

- 28 -

in cases involving the acts of licensed professionals, the rule may also be applied to trades people who hold themselves out as having a special skill, or who are required by statute to possess a certain level of skill. *Id.* at 1424.

Like the plaintiffs in *Moreno*, Mahler was unsophisticated in construction matters (SCR 2: 29, ¶2). In fact, Mahler's representative on site at the Project during construction, Jorden Mahler, had recently graduated from college in 2004 with a degree in criminal justice. *Id.* That is why Mahler hired DMAC in the first place. Mahler and DMAC occupied positions of unequal bargaining strength and only DMAC, as a professional contractor, had the commercial and technical expertise to appreciate fully the ramifications of agreeing to a defined accrual period. *See College of Notre Dame of Maryland, Inc. v. Morabito Consultants, Inc.*, 132 Md.App. 158 (Md.App.2000) (court observed that the standard form contract drafted by AIA enjoyed significant history and widespread use in the construction industry and was drafted by a staff of highly trained professionals). That conclusion is reinforced by the fact that Mahler did not have the participation and advice of legal counsel during contract negotiations (SCR 2: 110, ¶2). Mahler did not participate in drafting the terms and conditions of the contract. *Id.* According to Jorden Mahler, "[I]t was a take it or leave it negotiation in the sense that Mahler understood the contract presented had to be signed." *Id.* These facts alone take the instant case outside the parameters of the persuasive authority cited

by DMAC, which should be disregarded by this Court particularly in light of Texas public policy.8

### C. Article 13.7.1.2 did not negate the Discovery Rule pursuant to Texas public policy.

Texas public policy does not support enforcing paragraph 13.7 of the Contract where there are facts of intentional non-disclosure of latent construction defects. *See* TEX. CIV. PRAC. & REM CODE §16.009(e)(3) (Vernon's Supp. 2015) (the ten year Statute of Repose does not apply to fraudulent concealment of construction defects).

However, the Texas legislature has limited the scope of the discovery rule, even where the parties have not waived it by contract. *Id.* Specifically, section 16.009 CPRC provides that damage "arising out of a defective or unsafe condition of the real property or a deficiency in the construction or repair of the improvement," the claim must be brought no later than ten years after the construction is substantially complete, regardless of whether the plaintiff actually

---

8Assuming Article 13.7 of the Contract is enforceable, which is denied, Mahler asserts that the relevant provision is Article 13.7.1.3. Accordingly, as to DMAC's acts or omissions occurring after issuance of the final Certificate for Payment, Mahler's causes of action are deemed to have accrued not later than (1) the date of any act or failure to act by DMAC pursuant to any Warranty under Article 3.5, (2) the date of any correction of the Work or failure to correct the Work by DMAC under Article 12.2, or (3) the date of actual commission of any other act or failure to perform any duty or obligation by DMAC, *whichever occurs last*. Accordingly, assuming Article 13.7 is enforceable, DMAC committed a breach after substantial completion when it refused to correct and pay for the corrections to the doors, floors, and porches under Article 12.2 of the Contract (CR 1: 374-78).

discovers the injury within the ten year period.  *See* TEX. CIV. PRAC. & REM CODE §16.009 (Vernon's Supp. 2015).

However, under section 16.009(e)(3), the statute of repose does not bar an action "based on willful misconduct or fraudulent concealment in connection with the performance of the construction or repair." *Id.* at §16.009(e)(3).  Accordingly, Texas law recognizes the non-applicability of the statute of repose in construction cases where the contractor is guilty of willful or fraudulent concealment thereby potentially extending the accrual of the plaintiff's cause of action under the discovery rule to a date beyond ten years after substantial completion.

In the cases cited by DMAC, there was no suggestion of duress, fraud, misrepresentation, or unequal bargaining power.9  In those situations the outcome may be different.  For example, in *William L. Lyon & Associates, Inc. v. Superior Court*, 204 Cal.App.4th 1294 (2012), the trial court's denial of the defendant's motion for summary judgment on the basis of a statutory period of limitations was affirmed on appeal.  In doing so, however, the appellate court ruled that the

---

9*See College of Notre Dame of Maryland, Inc. v. Morabito Consultants, Inc.*, 132 Md.App. 158 (Md.App.2000) (parties may modify limitations result if there is no statute to the contrary, it is reasonable, and it is not subject to defenses such as fraud, duress, or misrepresentation); *Oriskany Central School District v. Edmund J. Booth Architects, A.I.A*, 615 N.Y.S2d 160, 206 A.D.2d896 (1994) (waiver of discovery rule provisions will govern in the absence of duress, fraud or misrepresentation); *William L. Lyon & Associates, Inc. v. Superior Court*, 204 Cal.App.4th 1294, 1308-1309, 139 Cal.Rptr.3d 670 (2012) (following *Moreno*; in the case alleging intentional nondisclosure of construction defects by real estate broker).

plaintiff's breach of contract action was subject to the limitations period in a buyer-broker agreement, but that the discovery rule applied. *Id.* at 1306.

In *Lyon*, the facts involved intentional nondisclosure of construction defects. *Lyon*, 204 Cal.App.4th at 1301-1302. The plaintiffs alleged that the sellers knew of the construction defects and problems but did not disclose them as part of the sale. *Id.* Instead, the sellers painted the house a dark brown color to conceal many of the problems. *Id.* While the house was listed for sale, rain caused many of the painted-over defects to reappear. *Id.* The sellers purchased more dark brown paint and covered up the newly visible damage prior to inspection by the plaintiffs. *Id.*

In concluding that the discovery rule applied to the contractual two-year limitations period, the *Lyon* court cited to the *Moreno* case and reasoned that the breach in question was nonobvious and inherently difficult to detect and Lyon & Associates should not reap the benefit of a shortened limitations period when its own malfeasance contributed to the delay in the discovery of the buyer's injury. *Lyon*, 204 Cal.App.4th at 1308-1311. Similarly, DMAC should not reap the benefit of a shortened accrual date through contractual elimination of the discovery rule when its own proven malfeasance caused the delay in the discovery of Mahler's injury. Moreover, DMAC cannot be permitted to avoid liability for its actions by intentionally creating the construction defect and thereafter deceitfully

concealing the wrongdoing until limitations has run. The contractual waiver of the discovery rule should be disregarded.

Here, the summary judgment evidence genuinely raises a fact issue if not dictates that DMAC knew about the structurally defective framing in the porches and intentionally built them in that manner and in violation of the law (CR 1: 6, ¶4; 369-71; SCR 2: 17). Accordingly, Mahler asserts that enforcement of section 13.7 of the Contract would offend Texas public policy under these circumstances. *See* TEX. CIV. PRAC. & REM CODE §16.009(e)(3) (Vernon's Supp. 2015) (the ten year Statute of Repose does not apply to fraudulent concealment of construction defects). A contract with provisions that are against public policy cannot be enforced. *City of the Colony v. North Tex. Mun. Water Dist.*, 272 S.W.3d 699, 730 (Tex. App.---Fort Worth 2008, pet. dism'd) (contract violates public policy if it has tendency to injure public good).

### D. Under the Discovery Rule, Mahler's Causes of Action Accrued No Sooner than May 22, 2012.

To obtain summary judgment, DMAC had to conclusively negate the discovery rule as a matter of law. *Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 530 (Tex. 1997). In order for the discovery rule to apply, the *nature* of the injury and its general cause must be *inherently* undiscoverable and the injury itself must be objectively verifiable. *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348,351 (Tex. 1990); *Bayou Bend Towers Council of Co-Owners v. Manhattan*

- 33 -

*Construction Co.*, 866 S.W2d 740, 742-743 (Tex. App.---Houston [14th Dist.] 1993, writ denied). An injury is inherently undiscoverable if by its nature, it is unlikely to be discovered within the prescribed limitations period despite due diligence. *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 930 (Tex. 2011).

Applying that standard, limitations do not begin when the full extent of the damage is known *or when the first damage is observed*, but rather when Mahler knew or should have known of the facts giving rise to its cause of action exercising reasonable diligence. *See Tenowich v. Sterling Plumbing Co., Inc.*, 712 S.W.2d 188, 189-190 (Tex. App.---Houston [14th Dist.] 1986, no writ).

### 1. Porch roofs.

DMAC relies on the Robinson inspection report dated August 16, 2007 as evidence that Mahler *knew* of the structural defects with the porch roofs and ceilings in the 2007-year (CR 1: 139-40). The Robinson inspection report notes "sag and unevenness" at the surface of the roof and at the ceiling below that area that "*may be due* to structure of insufficient stiffness to prevent the sag." *Id.* Notably, Mahler initiated the Robinson inspection and shared the inspection report with DMAC in 2007 (CR 1: 151, ¶4). However, limitations does not begin to run when the first damage is observed, but when Mahler knew or should have known of facts giving rise to his causes of action through reasonable diligence. *Tenowich,* 712 S.W.2d at 189-190.

DMAC makes essentially two arguments. First, DMAC contends Mahler should have discovered the structural defects in the porch roofs sooner through additional inspections. Second, DMAC argues that the Schilder inspection report dated May 22, 2012 discloses structural defects with the porch roofs "exactly like the observations of the original inspectors" of August 16, 2007 (CR 1: 70, ¶3). DAMC's arguments fail for multiple reasons.

Mahler's exercise of reasonable diligence simply did not result in the discovery of the structural defects in the framing of the porches. Mahler contacted DMAC after the Robinson inspection and furnished it with a copy of the report (SCR 2: 29-30, ¶4; 151, ¶4). On January 1, 2008, Mahler sent the email attached as Exhibit A to DMAC's motion out of *concern* that the size of the header board in the picture should be larger. The picture attached to the email of the 2x4 header board was actually taken in the 2006-year as the construction of the porches progressed but before completion and before Mahler observed any problems with the porches. However, Mahler expressing concern about the structure of the porches by inquiring about one picture of a 2x4 header board does not amount to knowledge that the framing of the porches was defectively built. Notably, DMAC never responded to Mahler's email. *Id.*

Robinson recommended that Mahler contact DMAC to perform an additional inspection because latent defects with the roof were outside the scope of

- 35 -

his inspection (CR 1: 173, 175). Mahler complied (SCR 2: 29-30, ¶4). As a result, on or about December 1, 2007, DMAC sent a daily worker to inspect the porches and perform repairs (SCR 2: 30, ¶6). Approximately one week later, on December 8, 2007, Mahler contacted DMAC a second time stating that the "porch ceilings have started to have a wave-look to them" and "were to be corrected." *Id.* On December 17, 2007, Bob Cooper of DMAC responded to Mahler "I have a contractor" to inspect the porches "in order to know exactly what his crew will need" (SCR 2: 30, ¶7). However, Cooper told Mahler that there were no structural concerns noted in the Robinson report or as a result of DMAC's subsequent inspections of the porches (SCR 2: 30, ¶9).

DMAC argues Mahler should have obtained an additional, independent inspection to satisfy reasonable diligence (CR 1: 141). Mahler didn't have to because Mahler relied on DMAC. After the DMAC contractor conducted the third inspection, on December 28, 2007, Cooper emailed Mahler stating that the hardiplank ceiling covering noted as having sags and unevenness in the Robinson report had been secured by using counter-sunk screws and caulked (SCR 2: 30, ¶8). Cooper proposed that Mahler either (1) fill the screws with caulk and paint or (2) feather float with ceiling texture and paint. *Id.* Mahler elected the second option and the results "looked great" (SCR 2: 30, ¶9). DMAC told Mahler that the problem had been fixed. *Id.*

The Schilder inspection report does not disclose structural defects with the porches "exactly like the observations of the original inspectors" on August 16, 2007.[10] Rather, the Robinson inspection report notes "sag and unevenness" at the surface of the roof and at the ceiling below that area that *"may be due* to structure of insufficient stiffness to prevent the sag" (CR 1: 103, ¶5). It should be noted that "sag and unevenness" that "may be due to structure of insufficient stiffness" would only mean, if true, that the "deflection criteria required by building code and design code were not met and are indicative of substandard material sizes and construction methods" (SCR 2: 10, ¶3). According to Schilder, Robinson's comments about the porch roofs and ceilings as of August 16, 2007, assuming same were true, which Robinson doesn't assume and merely recommends further inspection by the builder, would amount to only about ten percent of the structural defects Schilder reported in his report five years later. *Id.* As a result, Schilder opines the Robinson report did not provide notice of structural defects with the porch roofs. *Id.*

On April 24, 2012, Mahler hired an engineer to perform an inspection of the Project and discovered the construction defects inherent within the porch roofs

---

[10]The Schilder report notes structural deficiencies such as "inadequate and improper connection of rafters to columns;" "no beam supports between columns supporting exterior ends of rafters;" undersized rafters for spans;" "excessive rafter spacing;" and "inadequate and improper connection of rafter top end to nailer plate" (SCR 2: 14-15).

(SCR 2: 13). According to Schilder, all of the structural deficiencies he notes in his report existed in the porch roofs and ceilings at the time of the Robinson inspection. *Id.* at 10. The defects were not visible and outside the scope of the Robinson inspection and report. DMAC agreed that the structural defects with the porches would not have been "visible" in 2006 and 2007.

> Q. So would you agree if there was any defect with the structure back in 2006 or 2007, it was not visible?
>
> A. No visible.
>
> Q. Yeah, not visible?
>
> A. Right.
>
> Q. There might have been problems with it. I'm just saying it wasn't visible, right?
>
> A. Right, wasn't visible.

(SCR 2: 103). DMAC acknowledged that a licensed engineer or contractor like DMAC would be better than Mahler to inspect and report structural deficiencies with regard to the porches (SCR 2: 103, p.79:7-16, 17-22). In fact, DMAC concedes that Mahler was justified in relying on DMAC in making the repairs to porch framing. *Id.*

Accordingly, as for the questions of Mahler's exercise of diligence and determining the date of Mahler's discovery of the structural defects in the porches,

- 38 -

the trial court erred and the trial court's summary judgment should be reversed and remanded for further proceedings.

## 2. Floors.

Mahler's complaint regarding the floors is that DMAC installed a "residential grade" flooring product at Briscoe Manor, which is a wedding event center requiring commercial grade flooring designed specifically for higher traffic, higher loads, and higher abrasion occurrences (CR 1: 3-4).

In the motion for summary judgment, DMAC makes the following assertion unsupported, in part, by summary judgment evidence.

> And with respect to the flooring, the type, grade, and quality of the materials was certainly discoverable. (here, DMAC's cites footnote 4 that references Mahler's deposition testimony where Mahler admits DMAC made no representations regarding the grade of the flooring). If there even exists a bright-line distinction between 'commercial grade' and 'residential grade,' such basic product information about the floors would have been readily available from the vendor and the manufacturer. Plaintiff worked directly with the flooring vendor to select the flooring product and had access to product information from the outset. Plaintiff also had possession of leftover samples of the flooring material and information on how to contact the manufacturer on its property continually from the time of the Project's construction (Ex. B. at 39-40).

(CR 1: 143-44).

First, Mahler has never claimed that DMAC made *oral* representations regarding the grade of the flooring (CR 1: 6-12). However, Mahler does believe DMAC warranted that the flooring was suitable for its intended purposes (SCR 2:

- 39 -

45, ¶3.5). According to the Contract, the term "Work" means "the construction and services required by the contract documents . . . and includes all other labor, materials, equipment, and services provided . . . to fulfill the Contractor's obligations" (SCR 2: 41). Notably, in paragraph 3.5.1, DMAC warranted that "materials and equipment furnished under the contract will be of good quality and new" and that the "Work will be free from defects not inherent in the quality required" (SCR 2: 45-46). In fact, DMAC agreed to perform the Work in a good and workmanlike manner, which is universally known as an industry wide acceptable standard (SCR 2: 92). To be sure, there is no summary judgment evidence that Mahler required or permitted a "residential grade" flooring ("entire record") and the very nature of Mahler's complaint with respect to the floors is that they were not intended for commercial use (SCR 2: 6-12).

Second, DMAC's argument presupposes that because product information existed and was allegedly available that Mahler should have discovered the truth about the "residential grade" of the floors. By doing so, DMAC overlooks the inertia affect of Mahler's ignorance about the nature of the injury being that the flooring is actually rated for residential use and yet there is no ongoing effort to discover the truth. Other than observing some general wear and tear or replacing the floors in locations where the damage had become more substantial, Mahler had

no reason to obtain a professional inspection of the floors or even to contact the manufacturer or supplier to identify the type of flooring.

The breach of contract and warranty in this case arose out of intentional concealment of the residential grade of the floors by DMAC combined with DMAC's silence on the matter. This case is an example of a breach inherently difficult to detect. But DMAC concedes the possibility that there was "no bright-line distinction between 'commercial grade' and 'residential grade' in connection with the floors and assumes that "[I]f there even exists" such a distinction "such basic product information about the floors would have been readily available from the vendor and the manufacturer" (CR 1: 143-44). In that connection, DMAC makes the bare assertion that "Plaintiff worked directly with the flooring vendor to select the flooring product and had access to product information from the outset."[11] Although DMAC cites to no summary judgment evidence in support of that assertion, it is pure conjecture to conclude Mahler had knowledge of the "residential grade" of the flooring during the selection stage, assuming Mahler had any involvement in the first place. Finally, the fact that Mahler had "possession of leftover samples of the flooring material and information on how to contact the manufacturer on its property" does not mean that it knew of the "residential grade"

---

[11]DMAC has failed to point out where Jorden Mahler stated that in his oral deposition or by means of other summary judgment evidence ("entire record").

of the flooring and this Court must resolve all doubts about the summary judgment evidence in Mahler's favor.

The only summary judgment evidence that DMAC cites in its motion regarding Mahler's discovery or notice of any problem or damage with the floors is the following excerpts from the transcript of the oral deposition of Jorden Mahler, to-wit:

> Q. All right. So you would have noticed that you thought that there was some sort of premature wear issue in 2010, right?
>
> A. That could be said.
>
> Q. All right. And the floors that are in your lawsuit, you actually have already replaced those floors, right?
>
> A. The majority of it.
> Q. Okay. And –
>
> A. The common areas, yes.
>
> Q. And when were those floors replaced?
>
> A. The ballroom was replaced in May of 2011 and the chapel area was just done in December 2013.

(CR 1: 218). Although DMAC attached the following additional excerpts from the oral deposition of Jorden Mahler, it did not emphasize in its motion Mahler's testimony that reflects when he probably really first noticed "some premature wear issue" with the floors.

> Q. All right. So you replaced the floors that – or at least some of the floors that are at issue in this lawsuit.

Those in the ballroom were actually replaced in 2011, right?

A. Right.

Q. And that was a long time before this lawsuit was filed, true?

A. Right.

Q. And when you replaced those floors or when you started – well, let me ask you this: How long before you replaced them had you been noticing what you've described as premature wear?

A. Probably that year, probably really noticed.

Q. All right. So maybe for about a year leading up to when you replaced them?

A. Yes.

(CR 1: 219-20). Accordingly, DMAC proved that Mahler first noticed "premature wear" with the ballroom floors sometime in the 2010-year and in the chapel floors sometime in the 2012-year. On October 26, 2012, Mahler filed this lawsuit well within four years after those discoveries (CR 1: 6).[12]

However, what is required to commence the running of the statute of limitations is the discovery of the nature of injury and its general cause, not the

_____

[12]In its motion, DMAC relies erroneously on a comment in the Robinson report regarding the floors. Specifically, Robinson commented that the "floor stain floor finish" at the reception hall entry foyer, among other areas, showed evidence of wear and tear and discoloration (CR 1: 144). That is not the floor in question. Mahler has no complaint about the cement, stained floors but the vinyl composition tile flooring in the Ballroom, restrooms, the Chapel and foyer and total office space (SCR 2: 32, ¶14).

exact cause in fact, or the first discovery of damage, or even the extent of the injury with the floors. *See Tenowich v. Sterling Plumbing Co.*, 712 S.W.2d 188 (Tex. App.---Houston [14th Dist.] 1986, no writ). Aside from normal wear and tear that Mahler observed in the Fall of 2010 with the ballroom floor and in 2013 with the chapel floor, Mahler didn't have any knowledge that the floors were a *residential grade* until May 2011 when the installer of the new ballroom floor asked Mahler why it had installed residential grade flooring in a commercial setting (CR 1: 30, ¶13). Even if Mahler's first discovery of premature wear with the ballroom floor is sufficient to trigger the running of the statute of limitation, Mahler filed this lawsuit just over two years before limitations would run for breach of contract and breach of warranty, which DMAC concedes has a four year statute of limitation.

Accordingly, as for the defect with the floors in the form of either the premature wear or the fact of a residential grade, the trial court erred, and the summary judgment order should be reversed and remanded to the trial court for further proceedings.

## ISSUE FOUR

### IV. The Trial Court Erred in Granting DMAC's Motion for Summary Judgment on Mahler's Defense of Fraudulent Concealment.

#### A. Standard of Review

Mahler incorporates by reference the discussion of Mahler's burden of proof and the Standard of Review set forth in Issue III, A, pages 24-25 above by reference here and for all purposes.

#### B. A fact question exists on the elements of fraudulent concealment in connection with the Porch Roofs.

DMAC's motion did not ask for summary judgment on Mahler's defense of fraudulent concealment relating to the porches (CR 1: 145-148). As a result, the trial court granted more relief than DMAC asked for in its motion and the judgment should be reversed and remanded for that reason. In the Reply, however, DMAC challenged certain elements that Mahler must prove in connection with its defense of fraudulent concealment relating to the porches (CR 1: 287-290). Assuming DMAC has properly invoked summary judgment on Mahler's defense of fraudulent concealment, Mahler must raise a genuine issue of material fact in connection with those challenged elements.

#### 1. Mahler's reasonable diligence is a fact question.

To establish fraudulent concealment in connection with the porches, Mahler must prove it reasonably relied on DMAC's concealment of the condition of the

- 45 -

porches and representation that the unevenness at the surface of the roof and the sags and unevenness at the ceiling below that area had been "fixed." *See Shah v. Moss*, 67 S.W.3d 836, 841 (Tex. 2001) (elements of fraudulent concealment). In its Reply, DMAC argued that it "was simply a contractual counter-party, not Plaintiff's fiduciary, and Plaintiff could not therefore simply rely on alleged representations from DMAC in the face of the readily accessible information to the contrary described above" (CR 1: 288).[14]

However, "fraud prevents the running of the statute of limitations until it is discovered, or by the exercise of reasonable diligence might have been discovered." *Ruebeck v. Hunt*, 176 S.W.2d 738, 739 (Tex. 1943). Generally, "[c]auses of action accrue and statutes of limitation begin to run when facts come into existence that authorize a claimant to seek a judicial remedy," *Emerald Oil*, 348 S.W.3d at 202, but "a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run," *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996). Because "fraud vitiates whatever it touches," *Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex. 1983), limitations does not start to

---

[14]DMAC is wrong. The fact that DMAC may not be Mahler's fiduciary means only that DMAC has no duty of disclosure because of a special relationship. However, DMAC may have a duty to disclose in other scenarios, as more fully discussed below. *See, e.g., Hogget v. Brown*, 971 S.W.2d 472, 487 (Tex. App.---Houston [14th Dist.] 1997, pet. denied) (circumstances creating duty of disclosure). Finally, Mahler can rely on DMAC's representations if he didn't know enough to cause a reasonable person to disbelieve the misrepresentations. *See Mitchell Energy Corp. v. Bartlett*, 958 S.W.2d 430, 442 (Tex. App.---Fort Worth 1997, pet denied).

run until the fraud is discovered or the exercise of reasonable diligence would discover it, *Marshall*, 342 S.W.3d at 69. Although "the date a cause of action accrues is normally a question of law," *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 623 (Tex. 2011) (per curiam), reasonable diligence is an issue of fact, *Estate of Stonecipher v. Estate of Butts*, 591 S.W.2d 806, 809 (Tex. 1979).15

In *BP America Production Co. v. Marshall*, the Texas Supreme Court held the statute of limitations was not tolled when BP fraudulently represented that it was maintaining continuous operations on a lease. 342 S.W.3d 59, 67, (Tex. 2011).16 Notably, that case involved a sophisticated plaintiff who "understood the oil and gas industry." *Id.* at 69. The public record contained two public filings

---

15*See also Shah v. Moss*, 67 S.W.3d 836, 846 (Tex. 2001) ("To avoid summary judgment on limitations grounds, Moss must have raised a fact issue to support his fraudulent-concealment assertion"); *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987) ("[W]e agree that whether the plaintiffs knew or should have known of the fraud . . . raises a fact issue . . ."); *Borderlon*, 661 S.W.2d at 909 ("A fact issue exists whether, in the exercise of reasonable diligence, Borderlon knew, or should have known . . . . that the presence of the foreign object in her abdomen gave rise to a cause of action against Dr. Peck."); *Cherry v. Victoria Equip. & Supply, Inc.*, 645 S.W.2d 781, 782 (Tex. 1983) ("The ultimate duty to weigh the evidence, determine credibility and decide if fraudulent concealment actually existed rests upon the trier of fact."); *Ruebeck*, 176 S.W.2d at 740 ("What will constitute reasonable diligence to discover fraud and when the fraud might have been discovered by the exercise of such diligence are necessarily questions which must be determined from all the facts and circumstances in evidence in each particular case. When, under the facts in evidence, reasonable minds might differ on such issues, the findings of the jury thereon are binding on the appellate court.").

16DMAC relies extensively on the *Marshall* case in its Reply and, in quoting the Texas Supreme Court, incorrectly argued that "[t]he law in Texas is that 'reliance is not reasonable when information revealing the truth **could** have been discovered within the limitations period" (CR1: 287). Information revealing the truth could always be discoverable. However, in *Marshall*, the Texas Supreme Court held that fraud did not toll limitations because the plaintiffs "could have discovered wrongdoing by reviewing information in the public record. *Marshall*, 342 S.W.2d at 67-68.

- 47 -

with the Railroad Commission: a well log and a plugging report that contained "highly technical information." *Id.* at 66. Had the Marshalls read these those two documents together, they would have discovered that BP was not conducting good-faith continuous operations. *Id.* at 69. "[A]s a matter of law, the Marshalls would have been able to discover BP's fraud through the use of reasonable diligence." *Id.*

Similar conclusions have been reached in other cases. For example, if the plaintiff has "actual knowledge . . . of injury-causing conduct," then this "starts the clock on the limitations period" "irrespective of the potential effect of fraudulent concealment." *Emerald Oil*, 348 S.W.3d at 209. The availability of court records may indicate under some circumstances that reasonable diligence would have found the information. *See Kerlin*, 263 S.W.3d at 926. Land title records and probate proceedings create constructive notice, "an irrebuttable presumption of actual notice," which prevents limitations from being delayed. *Mooney v. Harlin*, 622 S.W.2d 83, 85 (Tex. 1981); *Sherman v. Sipper*, 152 S.W.2d 319, 321 (Tex. 1941). Those cases reveal that when there is actual or constructive notice, or when information is "readily accessible and publicly available," *Ross*, 356 S.W.3d at 929, then, as a matter of law, the accrual of a fraud claim is not delayed.

However, the instant case does not fall into any of the categories where one can determine, as a matter of law, that reasonable diligence would have timely uncovered DMAC's fraud. DMAC argues that Mahler's reliance on DMAC's

- 48 -

representations was unreasonable because "DMAC employs no engineers (structural or otherwise), Plaintiff knew that day laborers and contractors were the ones 'inspecting' the work for DMAC, and Plaintiff observed that DMAC's subsequent work did nothing to address the structure or framing of the roofs" (CR 1: 288).

First of all, just when did Mahler know that DMAC employed no engineers in connection with the Project? There is no evidence that Mahler knew that fact during construction ("entire record"). Schilder first interjected the legal requirement of a structural engineer as an *opinion* asserted in his report dated May 22, 2012 (SCR 2: 17). He later concluded that DMAC was in violation of Texas law when it constructed the porches without a structural engineer's involvement (CR 1: 368-371).[17] And, just when did Mahler know that having only DMAC inspect and repair the porches without addressing the structure or framing would not correct the sags and unevenness observed at the porch roofs and the ceiling below that area? Mahler did not know about the structural defects with the framing of the porches until April or May 2014 when Schilder produced his report (SCR 2: 31, ¶11). Accordingly, Mahler's reliance on DMAC's representations was reasonable.

DMAC's conclusion that Mahler didn't satisfy reasonable diligence because

---

[17]*See* TEX. GOV'T CODE §1001.056 (Vernon's Supp. 2015).

it made no independent follow-up investigation and was fully aware that DMAC made no repairs to the framing of the porches is premised on the theory that the Robinson report in 2007 evidenced structural defects in the framing of the porches (CR 1: 280-289). However, the Robinson report was generated after an inspection initiated by Mahler and noted that the porch roofs and ceilings had "sags and unevenness that *may be due to structure of insufficient stiffness*" (CR 1: 103, ¶5) (Emphasis added). Notably, the discovery and disclosure of latent construction defects was outside the scope of Robinson's inspection pursuant to the terms of the report itself. The notation "sags and unevenness that *may be due to structure of insufficient stiffness*" did not magically import actual knowledge of an issue with the structural integrity of the porches (CR 1: 92-93, ¶IC) (emphasis added). It put Mahler on notice of further inquiry and recommended reporting the issue to the contractor, DMAC.

And, Mahler did exactly that. Mahler's act of engaging Robinson in August 2007 and thereafter disclosing the issue of the porches to DMAC as recommended in the Robinson report satisfies, in part, his duty of reasonable diligence. At that point, DMAC had built the porches in a defective manner and concealed it. As pointed out by DMAC in its Reply, Mahler continued acting with reasonable diligence when, after "the daily worker guy" came out to make repairs, Jorden Mahler sent the December 8, 2007 email stating "the porch ceilings have started to

have a wave-look to them and were to be corrected." (SCR 2: 30, ¶6). After

DMAC then sent out another contractor to "feather float with ceiling texture and

paint," Mahler, again, sent another email, dated January 1, 2008, attaching

photographs of the porch roofs while they were under repair, which reflects the

actual rafters and other members of the structure, and Mahler expressed this

concern: "[L]ooks like only 2x4 (header) is what is attached at the building side.

I'm not an expert, but looks a little weak." (CR 1: 120-22). The summary

judgment record does not support that DMAC even responded to Mahler's inquiry

("entire record"). Applying the applicable SOR, this Court must resolve all doubts

in Mahler's favor and assume no additional information regarding the structural

integrity of the porches was conveyed to Mahler. Notably, the size of the headers

"at the building side" of the porches is not listed in the Schilder report prepared

four years later. DMAC's Bob Cooper, the on-site project manager, told Mahler

that there were no structural concerns noted in the Robinson report or as a result of

DMAC's post inspections and repairs of the porch roofs and ceilings (SCR 2: 30,

¶9). Cooper and other DMAC employees told Mahler that the porch roofs and

ceilings had been "fixed." *Id.* It is Texas law that a plaintiff reasonably relied on

the defendant's conduct if, despite exercising reasonable diligence, *it did not know*

*enough* to cause a reasonable person in its place to disbelieve the defendant's

misrepresentation or question the defendant's silence. *Mitchell Energy Corp. v.*

*Bartlett*, 958 S.W.2d 430, 442 (Tex. App.---Fort Worth 1997, pet. denied).

On the issue of Mahler's reasonable diligence, it should be noted that DMAC's counsel mischaracterizes Mahler's expert, Stephen Shilder's, affidavit testimony that Mahler would have fully uncovered all of the structural deficiencies with the porches through an earlier inspection than in May 2012 (SCR 2: 8-11). To the contrary, Schilder merely stated that the structural deficiencies in the porch roofs existed in August 2007, the date of the Robinson inspection and report, because they were built into the structure of the porch roofs at the time of the original construction in the 2006-year (SCR 2: 10). Schilder never speculated as to what Mahler may have discovered had it done an earlier inspection during the four-year period it believed there were no problems with the porches (SCR 2: 8-11). In fact, Schilder actually opined that there was no visible evidence of any structural defects (SCR 2: 10).

It cannot be said that, as a matter of law, Mahler should have discovered the general cause of the sags and unevenness in the porches was structural in nature after DMAC inspected them and represented that it had fixed the problem. Although reasonable diligence should investigate visible sags and unevenness with the porch roofs and the ceilings below that area, it may stop at DMAC's subsequent inspection and representation that the problems have been fixed, without needing to double-check DMAC's work and conduct a more invasive

inspection than performed by DMAC. As quoted above, "fraud vitiates whatever it touches," *Borderlon*, 661 S.W.2d at 909, in this case, the ceiling or soffit area below the porch roofs. It has been held that fraudulent concealment is "an equitable doctrine that . . . is fact-specific." *Marshall*, 342 S.W.3d at 67. And, it was also quoted above that "a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run." *S.V.*, 933 S.W.2d at 6. Though reasonable diligence should lead to an inspection and ultimately discovery through that inspection of the structural nature of the defects with the porches, here, DMAC's inspection and repair itself taints the discovery of the nature of the injury. To require, as a matter of law, that Mahler double-check DMAC's work and obtain a more invasive inspection than Robinson recommended is higher burden than reasonable diligence requires.

### 2.   DMAC's purposeful concealment argument is procedurally defective and raises a fact question.

DMAC next contends that Mahler "has submitted no evidence" that DMAC "acted with a fixed purpose to conceal" its wrongdoing in connection with the framing of the porches (CR 1: 289). As discussed in detail above, DMAC has again asserted a no-evidence "ground" for summary judgment in its Reply, which is procedurally defective and should be disregarded.

Nevertheless, DMAC attempts to negate "purposeful concealment" by arguing that the summary judgment evidence of DMAC's actual knowledge of its

- 53 -

wrongdoing in the form of the Affidavit of Barry Tarver, which DMAC concedes "provides some evidence that DMAC was aware of some deficiency in the porch roofs," provides no support for the "purposeful concealment" element because "as a non-fiduciary DMAC was under no obligation to disclose potential defects in its work" (CR 1: 289). DMAC's contention is misplaced and confuses the issues and the summary judgment evidence Mahler has offered to prove the element of "purposeful concealment."

To prove fraudulent concealment, the plaintiff must establish the defendant had a fixed purpose to conceal the facts the plaintiff needed to discover that a cause of action had accrued. *DiGrazia v. Old*, 900 S.W.2d 499, 503 (Tex. App.---Texarkana 1995, no writ) (silence does not constitute fraudulent concealment when D does not owe P a duty to disclose). There must be evidence that the defendant purposefully or intentionally concealed facts. *Id.* at 503. Purposeful concealment can be established by direct and circumstantial evidence showing that the defendant knew the statements were false when they were made. *See Earle*, 998 S.W.2d at 888-89.

By its argument, DMAC has conceded that by intentionally building the porch framing in a defective manner DMAC had a "fixed purpose" to conceal those facts. Mahler agrees. Mahler's summary judgment evidence that DMAC underbid the job and, even after being paid an additional $355,000.00, had an out

of pocket loss of $65,000.00, also would enable reasonable and fair-minded people to conclude that DMAC had a "fixed purpose" to conceal its intentional misconduct because it was more expensive to build the porches in a good and workman like manner (SCR 2: 31, ¶12). *See, e.g., Booker v. Real Homes, Inc.*, 103 S.W.3d 487, 494 (Tex. App.---San Antonio 2003, pet. denied) (contractor had fixed purpose to conceal the wrong because more expensive to perform job correctly).

DMAC's act of concealment in this case was not only accomplished through its silence but also through affirmative representations that the defects in the porches had been fixed or repaired (CR 1: 30, ¶9). DMAC's affirmative representations that the porches had been fixed also created a duty to disclose the truth. *See Booker*, 103 S.W.3d at 494 (in construction-defect case, D had duty as professional builder to disclose any problems with home that Ps, as layman, were unable to discover on their own). It is Texas law that a person has a duty to disclose in various situations including (1) when a party only voluntarily discloses only partial information, (2) when a party makes a representation that causes an earlier representation to be misleading or untrue, and (3) when a party makes a partial disclosure that conveys a false impression. *See Hogget v. Brown*, 971 S.W.2d 472, 487 (Tex. App.--Houston [14th Dist.] 1997, pet denied). In his oral deposition taken on July 16, 2014, McIntyre continued to insist that DMAC

"fixed" the problems with the porch roofs (SCR 2: 94, p.41: 8-10): Q. "Well, what did you do about it when you heard something about it in 2007? A. Fixed it."). By stating that the porches had been fixed, DMAC was actually communicating that it had cosmetically repaired the porch ceilings, which conveyed a false impression, because the repair did not address the internal framing structure that was the cause of the sags and unevenness manifesting in the porch ceilings and roof tops noted in the Robinson report in 2007 and, again, in the Shilder report in May 2012. Finally, Mahler's deposition testimony does not deny any concealment, as argued by DMAC, but rather reflects that as of the date of his oral deposition, Mahler knew that DMAC made no cosmetic repairs to the porch roofs but only to the porch ceilings or soffit area by concealing the sags and unevenness through the work of the repair and "they reassured me that it was okay." (CR 1: 242).

DMAC did not even attempt to negate the other elements of fraudulent concealment as it relates to the porches. As a result, the trial court erred, and the summary judgment on fraudulent concealment as it relates to the porches should be reversed and remanded to the trial court for further proceedings.

C.    Fraudulent concealment and "equitable estoppel" preserve
       Mahler's claims pertaining to the doors and floors.

DMAC contended that Mr. Mahler testified that no DMAC representative "ever lied to you about the doors or the floors" and; therefore, DMAC never made

any misrepresentation to Mahler (CR 1: 145). DMAC claims that Mr. Mahler's admission conclusively negates that DMAC misrepresented or concealed the nature and quality of the doors and floors. *Id.*

With respect to the floors, the summary judgment evidence supports that the flooring product installed is not approved or suitable for Mahler's purposes. Specifically, residential grade floors were installed in place of commercial grade flooring (SCR 2: 15). According to Schilder, "[t]his fact was confirmed by the flooring manufacturer's specifications and the product submittals provided to the general contractor *prior to installation of the flooring material.*" (SCR 2: 9, ¶1) (emphasis added). Although DMAC knew about the commercial grade flooring from the beginning, Mr. Mahler did not learn of that fact until May 2011 and thereafter confirmed it though the manufacturer (SCR 2: 30-31, ¶10). Mr. Mahler immediately contacted Lance McIntyre of DMAC and told him about the floors and Mr. McIntyre stated that "You know we were on a tight budget" and inquired whether Mahler intended to sue (SCR 2: 31, ¶10).

Mr. McIntyre's statement further supports that DMAC concealed the fact of installing the wrong type of flooring. DMAC's silence regarding the commercial grade flooring amounts to a misrepresentation because DMAC had a duty to disclose. *See, e.g., Booker v. Real Homes, Inc.*, 103 S.W.3d 487, 494 (Tex. App.---San Antonio 2003, pet. denied) (in construction-defect case, D had duty as

professional builder to disclose any problems with home that Ps, as laymen, were unable to discover on their own). DMAC's duty of disclosure is particularly appropriate here given that it agreed that the floors "will be of good quality and new" and "free from defects not inherent in the quality required or permitted." (SCR 2: 45-46, ¶3.5.1).

With respect to the floors, DMAC argued again that Mr. Mahler's testimony conceded he was never lied to about the doors and that Mr. Mahler learned in 2007 that the doors didn't have a warranty if they were hung in an exterior application. (SCR 2: 145-46, f.n.#5). However, Mahler's complaint with respect to both the doors and floors has nothing to do with the loss of the manufacturer's warranties and instead with the fact that DMAC installed interior grade doors in exterior locations and residential grade flooring in place of commercial grade flooring. Contrary to Mr. Mahler's mistaken deposition testimony, DMAC representatives indeed represented to Mahler and convinced Mahler that the doors installed were appropriate and of good quality.

As late as December 28, 2007, during the time that DMAC was completing warranty and punch-list work, Cooper continued to mislead Mahler to believe that the doors installed for an exterior application was appropriate.

    • You continually keep bringing up the exterior doors, time and time again, thus labeling them 'interior doors.' Do you or Bill have P-lam or metal doors on any or all of your doors at your home? Of course not, they are wood! Solid wood doors that are sealed and either

painted or stained and varnished properly are *used as "Exterior Doors" as well as metal or glass doors*. If these doors were hollow core doors, that would be different. They are not! If you remember, we bought heavy duty *marine* varnish to add over the manufacture's coat *for longer protective measures*. So your decision to take our check 'back to the bank' because of your perceived 'scenario, and being mislead about the doors' comes across to me as being a very inappropriate decision on your part!

(CR 1: 30, ¶8; 82). DMAC should be estopped from asserting the statute of limitations because DMAC representatives intentionally misled Mahler. The doctrine of equitable estoppel bars a defendant from raising the defense of limitations when it, its agent, or its representative made representations that induced the plaintiff to delay filing suit until after limitations ran. *Villages of Greenbriar v. Torres*, 874 S.W.2d 259, 264 (Tex. App.---Houston [1st Dist.] 1994, writ denied). Furthermore, Mr. Cooper's email certainly amounts to a misrepresentation for purposes of satisfying the elements of fraudulent concealment relating to the doors.

DMAC next argues that Mahler did not rely on anything DMAC said or didn't say about the floors and doors and, even assuming such reliance, Mahler had sufficient information in its possession to render any reliance unreasonable had Mahler exercised reasonable diligence (CR 1: 146). Mr. Mahler's affidavit clearly supports that Mahler relied on DMAC representations when he was told the doors "were appropriate and that DMAC would apply some marine varnish to extend the life." (SCR 2: 31, ¶11). It is also clear that Mr. Mahler relied on DMAC's silence

- 59 -

regarding the floors because he was "shocked" by the floor installer's statement in May 2011 about the fact that residential grade flooring had previously been installed (SCR 2: 30-31, ¶10).

DMAC cites *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 68 (Tex. 2011), for the proposition that Mahler's reliance on DMAC's representations and silence regarding the floors and doors was not reasonable when information revealing the truth could have been discovered within the limitations period. Again, however, that case involved a sophisticated plaintiff who could have discovered the defendant's wrongdoing by reviewing information available in the public record. *BP Amer. Prod. Co.*, 342 S.W.3d at 67-69. Here, Mahler was not sophisticated and this case does not fall into the category where one can determine, as a matter of law, that reasonable diligence would have timely uncovered DMAC's fraud. Rather, the fact that DMAC installed residential grade floors and interior grade doors was inherently difficult to detect as can be determined from reviewing Schilder's descriptions in his affidavit (SCR 2: 15). Reasonable diligence is an issue of fact, *Estate of Stonecipher v. Estate of Butts*, 591 S.W.2d 806, 809 (Tex. 1979).

There is a genuine issue of material fact. This Court should reverse and remand to the trial court for further proceedings.

# PRAYER

For the above reasons, the trial court erred in several significant ways. Mahler requests this Court to reverse the granting of summary judgment in DMAC's favor and remand to the trial court for further proceedings.

Respectfully submitted,

*/s/ Christopher D. Nunnallee*
JEFFREY J. TOMPKINS
Texas Bar No. 20125500
1413 Brittmoore Road
Houston, Texas 77043
Telephone: 713-787-5333
Facsimile: 713-787-5334
OF COUNSEL:
CHRISTOPHER D. NUNNALLEE
Texas Bar No. 24025568
1413 Brittmoore Road
Houston, Texas 77043
Telephone: 713-787-5333
Facsimile: 713-787-5334
**ATTORNEYS FOR APPELLANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion to Extend Time to File Brief was served by Facsimile Transmission and the Court's Electronic Filing System on the 8th day of November, 2015, to all parties entitled to receive such notice, including the parties list below:

James A. Schuelke                    *FACSIMILE TO 713.485.7250*
REYNOLDS FRIZZEL LLP
1100 Louisiana Street, Suite 3500
Houston, Texas 77002
Attorney for DMAC Construction, Inc.

*/s/ Christopher D. Nunnallee*
CHRISTOPHER D. NUNNALLEE


## CERTIFICATE OF COMPLIANCE

I hereby certify that the above-referenced Appellant's Amended Brief contains text in a conventional type-face, which is no smaller than 14-point font, and consists of 12,972 words in accordance with Texas Rules of Appellate Procedure 9.4(e), (i)(2)(B).

*/s/ Christopher D. Nunnallee*
CHRISTOPHER D. NUNNALLEE

# IN THE COURT OF APPEALS
## FOR THE FOURTEENTH DISTRICT OF TEXAS
### AT HOUSTON

---

## NO. 14-15-00061-CV

---

## B. MAHLER INTERESTS, L.P.,

**Appellant,**

## V.

## DMAC CONSTRUCTION, INC.

**Appellee.**

---

## APPELLANT'S APPENDIX

---

### LIST OF DOCUMENTS

1. Final Summary Judgment dated October 17, 2014
   (CR 1:349)............................................................................................ Tab A

7/18/2014 6:29:45 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 1880962
By: SMITH, SALENE

CAUSE NO. 2012-64035

| | | |
|---|---|---|
| B. MAHLER INTERESTS, L.P. | § | IN THE DISTRICT COURT |
| *Plaintiff* | § § § | |
| vs. | § § | HARRIS COUNTY, TEXAS |
| | § § | |
| DMAC CONSTRUCTION, INC. | § § | 152ND JUDICIAL DISTRICT |
| *Defendant* | § § | |

## FINAL SUMMARY JUDGMENT

On the 8th day of August 2014, came on for hearing Defendant's Amended Traditional and No-Evidence Motion for Summary Judgment, and the Court, having considered the Motion, Plaintiff's Response, Defendant's Reply, and the argument of counsel, ORDERS that Defendant's Amended Traditional and No-Evidence Motion for Summary Judgment should be and hereby is GRANTED.

The Court therefore RENDERS JUDGMENT for Defendant, DMAC Construction, Inc.

The Court ORDERS that Plaintiff take nothing on its claims against DMAC Construction, Inc. and that DMAC Construction, Inc. recover all court costs from Plaintiff.

This judgment finally disposes of all claims and all parties, and is appealable.

The Court ORDERS execution to issue for this judgment.

OCT 1 7 2014

SIGNED and ORDERED this ____ day of August, 2014.

Judge Presiding

4827-6643-9963, v. 2

EXHIBIT
A

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging